of Brogan's sentence by two levels for abuse of a position of trust, and **REMAND** for resentencing consistent with this opinion.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2001 FED App. 0032P (6th Cir.)
File Name:  01a0032p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          *v.*

KEVIN THOMAS BROGAN,
          *Defendant-Appellant.*

No. 99-1602

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No.  98-80642—Lawrence P. Zatkoff, Chief District Judge.

Argued:  November 3, 2000

Decided and Filed:  January 31, 2001

Before:  KEITH, BOGGS and COLE, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:**  Sanford Plotkin, LAW OFFICES OF ARTHUR JAY WEISS, Farmington Hills, Michigan, for Appellant. Patricia G. Gaedeke, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.  **ON BRIEF:** Sanford Plotkin, LAW OFFICES OF ARTHUR JAY WEISS, Farmington Hills, Michigan, for Appellant.  Patricia G. Gaedeke, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

1

---

### OPINION

---

BOGGS, Circuit Judge. Kevin Brogan was the assistant treasurer of a Michigan corporation, from whom he misappropriated, through means of a fraudulent wire transfer, the sum of $7.9 million. Brogan pled guilty to one count of bank fraud, in violation of 18 U.S.C. § 1344, and was sentenced to 57 months in prison. Brogan's sentence was enhanced by the court, over government objection, for his abuse of a position of trust. Brogan appeals this sentence enhancement, claiming his former job does not qualify as a "position of trust." USSG § 3B1.3. For the reasons given below, we reverse Brogan's sentence and remand for resentencing.

### I

Kevin Brogan wanted to be a millionaire, and for a few weeks in the summer of 1998, he got his wish. Brogan is a graduate of the University of North Carolina at Charlotte, where he received a B.S. in Business Administration (Finance) in 1995, and obtained a job with Oakwood Homes Corporation. His position there was manager of financial analysis, with a salary of $50,000. He worked at Oakwood until May 28, 1997.[1]

Brogan was hired by Champion Enterprises of Auburn Hills, Michigan on May 14, 1998. Champion manufactures mobile and modular homes, and hired Brogan as its "assistant treasurer,"at a salary of $60,000. On June 4, 1998, Brogan filed articles of incorporation in Michigan establishing "Champion Companies, Inc." with himself as president. He opened a bank account at First Chicago-NBD for "Champion

---

[1] The circumstances of Brogan's forced termination from his previous job are the subject of a 16-count bank fraud indictment in the Middle District of North Carolina.

with the power to conceal the diversion. Brogan initiated a completely *ultra vires* eight-million-dollar transfer to an account in his own name, covered over with an apparently paper-thin explanation based on an imaginary debt payment. And it worked. Brogan, although keeping his day job with Champion, then settled into the life of local notable, purchasing a large home in the area, a fleet of luxury cars, and a couple of jet skis, and placing the bulk of "his" fortune in low-risk investments in the same bank to which he had transferred it. One can sympathize with the district court in seeking a rational explanation for these events, by in effect viewing Brogan's expectations of success as somehow reasonable.

However, the record shows some evidence that Brogan suffers from psychological problems, variously called "obsessive-compulsive disorder" or "impulse control" disorder. These may have inflated his estimate of success from that appropriate to his position in the company, or encouraged him to proceed despite the probability of being caught. Although our decision must ultimately be controlled by the failure of the government to offer a preponderance of evidence showing Brogan's job to be a position of trust, these facts may help explain why Brogan might have proceeded as he did, despite having no reasonable expectations of success.

Brogan did not have a position of trust, so he could not abuse such a position. Even though Brogan's "position significantly aided him in the commission and concealment of his offense, . . . [this does not] override[] the inherently clerical nature of his position." *Tribble*, 206 F.3d at 637. The lower court placed too little emphasis on the authority and discretion Brogan's job actually entailed when it inquired if he had violated the heightened duty of trust implicated by § 3B1.3. This sentence enhancement is meant to discourage violations of the kind of trust we show to our fiduciaries and public officials – and we conclude that the misplaced reliance and lack of supervision Champion showed toward Brogan was not this sort of institutionalized and necessary trust relationship. Accordingly, we **REVERSE** the enhancement

Brogan's job. The government instead analogizes to *United States v. Deal*, 147 F.3d 562, 564 (7th Cir. 1998), which involved payment of a phony debt covered over by a false explanation accepted by superiors. However, *Deal* involved the chief financial officer of the corporation who "doctored" financial records to conceal his crime. Aside from the substantial difference between Brogan's position and a CFO, there is no evidence Brogan actually "doctored" records to make it appear as if PNC Bank was to be paid the money he took or as if it in fact had been paid; neither is there evidence that he had the ability to do so. This also distinguishes Brogan from *Allison*, even if one were to treat that case as precedent.

The government argues Brogan was in a unique position to misdirect electronic funds transfers, and was "trusted to handle" more money than an "ordinary bank teller." (Gov't Brief, at 7). *Cf. United States v. Williams*, 993 F.2d 1224, 1228 (6th Cir. 1993) (reversing enhancement where other employees could also have committed the crime). First, Brogan's position was not "unique," since misdirection of funds seems to have been possible for those officers in Champion who either authorize wire transfers or approve and complete them. Second, even if Brogan could misdirect transfers, it is not obvious that he was in a unique position to have this misdirection accepted at face value. Third, under the reasoning of *Ragland* and *Tribble*, a focus on ability rather than trust relationship somewhat mistakes our inquiry. Below, the government (when it objected to the imposition of the enhancement) characterized Brogan as being essentially a "computer programmer or technician." The government continues to say carefully that Brogan "handled" millions of dollars. But this difference between "handling" and "administering" property is fundamental to identifying the discretionary powers whose abuse is punished by § 3B1.3. *See Tribble*, 206 F.3d at 637.

Under usual circumstances, one still might be tempted to wonder at Brogan's confidence in his ability to commit the crime if, as we shall hold, he did not occupy a position of trust

Companies," informing bank officials he was intent on developing a chain of Krispy Kreme doughnut shops.

One of Brogan's main tasks at Champion Enterprises was to set up wire transfers for his employers. Brogan would receive instructions from his supervisors about transactions they wanted, and Brogan would then put these into the proper format on his computer for receipt by the electronic funds transfer system. He would then take the properly formatted information and give it to one of the four supervisory personnel who could execute the transfer. These four individuals had a secure diskette and a password that allowed them to release electronic funds of Champion Enterprises.

On June 16, 1998, as part of a group of legitimate wire transfers he had prepared, Brogan arranged for an additional transfer of $7,989,876.52 from the account of Champion Enterprises at Comerica Bank, this extra transfer going to the account he had set up at First Chicago-NBD for Champion Companies. On appeal, and even after oral argument, we are still unclear as to exactly how Brogan achieved this feat. Champion Enterprises and the government at one time appear to have believed that Brogan somehow illegally obtained one of the disks and the password while at work. However, it appears more probable that Brogan simply handed the form to one of the authorized persons, the assistant controller, who released the funds. (Gov't Brief, at 4). According to Brogan's testimony, the assistant controller did subsequently ask Brogan about the transfer, but seemed satisfied with his explanation that it was a pay-down on a large loan (a revolving line of credit) that the company had with PNC Bank in Pittsburgh.

During the last two weeks of June 1998, Brogan transferred $340,000 from the First Chicago-NBD account to his personal account at Standard Federal Bank. He also transferred $400,000 to the account of a builder from whom Brogan was purchasing a home in the Detroit area. He appears to have invested the remainder in conservative commercial paper at First Chicago-NBD. Brogan went on something of spending

spree out of his Standard Federal account, purchasing, *inter alia*, a new BMW and two new Mercedes.

Brogan was caught by his own bank, the loss prevention officers at First Chicago-NBD. In early July, they began to be suspicious of Brogan's Champion Companies account and traced the original source of the account deposits (the wire transfer) back to Comerica Bank. Upon investigation, Comerica identified Kevin Brogan as one of their listed contacts at Champion Enterprises, a long-time Comerica customer. On July 7, 1998 they contacted the general counsel at Champion Enterprises and the scheme was revealed, with Brogan confessing immediately.

Brogan entered into two Rule 11 plea bargains with federal prosecutors in exchange for accepting a default judgment in forfeiture proceedings against him. *See* Fed. R. Crim. Proc. 11. The unrecovered loss now attributed to Brogan is approximately $70,000. The first Rule 11 agreement set a cap at 37 months. The second Rule 11 agreement took into account the four-level enhancement for affecting a financial institution for over $1,000,000. USSG § 2F1.1(b)(6)(B). This generated a guideline range of 46-57 months (offense level 23; CHC I), but the government agreed to cap the sentence at 51 months. Neither agreement included the two-level adjustment for abuse of a position of trust. When this was included in the pre-sentence report the government (and Brogan, naturally) objected to the enhancement.

At sentencing, however, the lower court rejected the contention of Brogan and the government on this point and the Rule 11 agreement based on it. The court instead adopted the pre-sentence report's position and based the sentence on offense level 25, generating a guideline range of 57-71 months. Brogan did not withdraw his guilty plea and was sentenced to 57 months.

The court's finding on the position of trust issue appears to have been based on three factors: (1) the job description of Brogan's position found in the pre-sentence report; (2) the willingness of his superior to believe his explanation of the

trust. The court thus looked at what in fact happened, rather than inquiring into "the inherent nature of the work" Brogan performed and the discretion he was accorded in his position. There is no doubt, of course, that Champion "trusted" Brogan despite his short service with them, or at least the corporate officer did who approved the wire transfer and believed Brogan's lie. This somewhat distinguishes Brogan from the defendants in *Ragland* and *Tribble,* whose credibility with the company was never measured because the relevant transactions were concealed. However, the more relevant question is whether Brogan could have expected to receive such credibility given the responsibilities of his position. There seems to be insufficient evidence there existed a "fiduciary-like" relationship that gave him the capacity to perpetrate his fraud.

Brogan had possession of almost eight million dollars for three weeks. Like the defendant in *Ragland*, the crime was inevitably going to be discovered, and "it was only by blind luck that [he] was not discovered sooner." 72 F.3d at 503. Alternatively, one could attribute his temporary success to light supervision or lax auditing procedures, but neither of these would generally be sufficient, standing alone, to warrant application of the enhancement. *See Tribble*, 206 F.3d at 637. Visual inspection of Brogan's wire transfer might or might not have plainly shown to the casual supervisor that the money was not going to PNC in Pittsburgh. However, it appears from the record that no such transfer had ever been authorized. A question to whoever was purported to have authorized the wire transfer (on which the record remains unclear) would have, presumably, immediately revealed Brogan's crime.

The government agrees that Brogan "was not given the authority to transfer multi-million dollar sums without the final approval of a superior." (Gov't Brief, at 7). Apparently, Brogan did not even have the ability to initiate a wire transfer of any size. The job description of the assistant treasurer later presented by Champion that includes "managing the daily cash position" is not asserted by the government as describing

infrequently.  *See* 206 F.3d at 635.  We reversed the lower court's application of a § 3B1.3 enhancement.  *See id.* at 637.

In *Ragland*, a bank teller pocketed the money given to her by customers for certificates of deposit, then forged the signatures of bank officers on the CD certificates, "issuing" them to the customers without recording them with the bank.  The defendant had no authority to issue the instruments – her role "was essentially secretarial" – but over several years she stole over a million dollars.[3]  72 F.3d at 501.  We held her position was not one warranting application of the enhancement, reversing the lower court.

We upheld use of the enhancement in *United States v. Allison*, 59 F.3d 43 (6th Cir. 1995).  Allison was a cashier at an insurance company.  After getting an executive signature on the checks she was drafting for company creditors, she altered the payee to herself or her personal creditors.  Allison was also responsible for reconciling canceled checks with those issued; when her altered checks came back from the bank, she simply altered the payee line on the canceled check back to the originally intended recipient.  This effectively concealed her activities within the company, and her scheme netted $454,000 over 21 months.  *See id.* at 44.  We did note that enhancement was warranted because of her positional capacity to conceal her theft, *id.* at 46, however the enhancement was actually upheld on other grounds (Allison had agreed to it in her plea bargain), and the court's finding on the merits is now considered dicta.  *Tribble*, 206 F.3d at 636.

Brogan does not appear to merit application of the abuse of position of trust enhancement under our current precedents.  The district court reasoned that, given the amount of money involved, and the willingness of Champion to accept Brogan's bogus explanation regarding it, Brogan was in a position of

---

[3]Ragland used some of the funds in a Ponzi-like scheme to pay interest on earlier CDs issued to "her" customers, operating as a sort of one-person bank within a bank.

wire transfer; and (3) the sheer size of the theft.  The job description as used in the pre-sentence report gives the responsibilities of the "assistant treasurer" as including: "structuring and monitoring of all forms of debt financing; short and long term investments; managing the daily cash position of the company; managing the risk management process for the corporation; developing and analyzing requests for proposals for a range of banking, cash management, and risk management services; and acting as a liaison between various financial institutions."  This description was given to the pre-sentence writer by Champion Enterprises.  The lower court did not explicitly rely on this description but "agree[d] fully with the probation officer's analysis," which in turn is based on the above description.  Particularly damaging to Brogan is the description's assertion that he was responsible for managing the company's "daily cash position," which would it make more plausible that transactions such as pay-downs reducing the debt the company carried were within his purview, and that his superiors appropriately trusted Brogan's false explanation for the wire transfer.

Brogan contends this job description was created post-hoc by Champion Enterprises and did not describe Brogan's actual duties, which were more akin to those of a computer programmer or technician.  The government agreed with Brogan's view explicitly in the lower court and does not seem to have changed its fundamental view on appeal.[2]  Instead, it argues there was a legal basis for the district court decision, despite acknowledging that Brogan had no independent authority to make wire transfers of the type at issue.  (Gov't Brief, at 7).

---

[2]Indeed, the government suggested below that this job description may have been generated in order to shield Champion Enterprises from problems with its insurer.

## II

### *Standard of Review*

The decision of a lower court to apply USSG § 3B1.3 is treated as question of law in the Sixth Circuit. "We review de novo the District Court's determination that [defendant] occupied a position of trust for the purposes of the Sentencing Guidelines." *United States v. Tribble*, 206 F.3d 634, 635 (6th Cir. 2000). *See also United States v. Ragland*, 72 F.3d 500, 502 (6th Cir. 1996).

A position of trust under the guidelines is one "characterized by professional or managerial discretion." USSG § 3B1.3, comment. (n.1). The guidelines continue by explaining that "[p]ersons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." *Ibid.* Although a number of cases on this issue look to how well the individual in fact was supervised, we have recently reaffirmed that "the level of discretion accorded an employee is to be the decisive factor in determining whether his position was one that can be characterized as a trust position." *Tribble*, 206 F.3d at 637 (criticizing over-emphasis on the amount of supervision an employee receives). The "position" must be one "characterized by substantial discretionary judgment that is ordinarily given considerable deference." *Ragland*, 72 F.3d at 503.

Under *Ragland*, the rationale for the sentencing enhancement is akin to punishment for violating a fiduciary duty, a higher duty than the ordinary one placed on all employees and breached by conversion. *See* 72 F.3d at 503. The trust relationship arises when a person or organization intentionally makes himself or itself vulnerable to someone in a particular position, ceding to the other's presumed better judgment some control over their affairs. *See ibid.* Indeed, the guideline examples of where the enhancement is appropriate correspond to the types of relationships where fiduciary duties are often implied: physician-patient, lawyer-client, officer-organization. By contrast, basic employment

positions such as an "ordinary bank teller" or "hotel clerk" are mentioned as inappropriate. *See* USSG § 3B1.3, comment. (n.1). In general the formation of these sorts of confidential interdependent relationships is socially beneficial. Such relationships require, however, "faith in one's fellow man," which is generally undermined when an instance of abuse occurs. *Ragland*, 72 F.3d at 503. In effect, *Ragland* suggests that an important purpose of § 3B1.3 is the defense of private ordering based on trust (or presumably in cases where "public trust" is violated, the necessary faith citizens must have in government for a well functioning republic); this separate wrong merits additional punishment.

Another purpose of § 3B1.3, which post-*Tribble* must now be considered secondary, is the provision of additional deterrence for crimes that are "difficult to detect" due to the defendant's position. *See* USSG § 3B1.3, comment. (n.2). This would potentially serve to raise the expected cost to those tempted by an ability to conceal their transgressions. However, according to *Tribble*, it is the "inherent nature of the work" involved, in which substantial non-ministerial agency has been bestowed, that should control the inquiry. 206 F.3d at 637. Thus, *Tribble* distinguishes employees who administer another's property from those authorized only to handle it but who are lightly supervised. *See ibid.*; *cf. United States v. Ward*, 222 F.3d 909, 912 (11th Cir. 2000) (vacating § 3B1.3 enhancement applied to armored car guard who stole from his currency delivery because his job lacked discretion). Although both types of employees have the ability to commit crimes difficult for the victim to detect, it is the former type that normally warrants the abuse of trust enhancement.

*Tribble* involved a postal clerk who diverted checks from business customers by entering and then voiding his receipt of the funds, issuing himself money orders from the "excess" cash in his drawer. Tribble was monitored on a daily basis by inspection of the transactions on his computer, but his voiding of the receipt kept the checks out of this system. An audit, which would have revealed the theft, was conducted only