RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0254P (6th Cir.)
File Name: 01a0254p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
　　　　*Plaintiff-Appellee,*

　　*v.*

JOSEPH LONNIE HODGE,
　　　　*Defendant-Appellant.*

No. 00-1544

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 95-00095—Richard A. Enslen, District Judge.

Argued: June 6, 2001

Decided and Filed: August 3, 2001

Before: BATCHELDER and MOORE, Circuit Judges;
BERTELSMAN, District Judge.[*]

———————————

## COUNSEL

**ARGUED:** Melvin Houston, Detroit, Michigan, for Appellant. Donald A. Davis, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for

———————————

[*] The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

Appellee. **ON BRIEF:** Melvin Houston, Detroit, Michigan, for Appellant.  Donald A. Davis, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.

————————

**OPINION**

————————

KAREN NELSON MOORE, Circuit Judge.  Defendant-Appellant Joseph Lonnie Hodge appeals his conviction and sentence on one count of mail fraud.  Hodge's first claim is that he did not knowingly or voluntarily enter a guilty plea pursuant to Fed. R. Crim P. 11 because he was not informed of the amount of restitution that he would be obligated to pay prior to entering his plea.  He also challenges the district court's application of United States Sentencing Guidelines Manual ("U.S.S.G.") § 3B1.3 to his sentence, which increased his base offense level by two levels for the abuse of a position of trust.  Hodges seeks a new plea hearing, a new trial, or a new sentencing hearing.  For the following reasons, we **AFFIRM** the defendant's conviction and sentence.

## I.  BACKGROUND

In June 1995, Hodge was indicted by a federal grand jury in the Western District of Michigan on a 34-count indictment which charged him with violating 18 U.S.C. § 1341 (mail fraud) (Counts 1-30), 18 U.S.C. § 1702 (embezzlement of mail) (Counts 31-32), and 18 U.S.C. § 1001 (false statements) (Counts 33-34). The charges stemmed from Hodge's scheme to defraud health care insurance companies.  From 1989 to 1991, Hodge directed and provided therapy sessions at Alternatives Counseling Ltd., ("Alternatives"), a state-licensed substance abuse counseling facility.  According to the indictment, Hodge committed two kinds of fraud:  first, without the knowledge of the supervising psychiatrist or psychologist whom he employed at the counseling center, he signed those supervisors' names on insurance claims forms and then submitted the claims to the insurance companies, in

violation of insurance company regulations; second, he improperly billed insurance companies for services his facility did not provide. In connection with the billing scheme, he also fraudulently signed reimbursement checks and deposited them in his own bank accounts.

Pursuant to a written plea agreement, Hodge agreed to plead guilty to one count of mail fraud in exchange for the dismissal of all remaining counts against him. On July 26, 1996, Hodge entered a plea of guilty before the district court to one count of the indictment. The district court declined to accept Hodge's guilty plea that day, and deferred its decision until December 3, 1996.

The district court ultimately accepted Hodge's plea of guilty and sentenced him on April 25, 2000.[1] The Presentence Investigation Report established Hodge's total offense level at 11 and his criminal history category at III. Hodge's total offense level reflected a two-level upward adjustment for abuse of a position of trust, pursuant to U.S.S.G. § 3B1.3. In accordance with the Presentence Report's recommendation, the district court sentenced Hodge to 18 months' imprisonment and 3 years' supervised release. Hodge was also ordered to pay $14,369.00 in restitution, a $100.00 fine, and a $50.00 assessment. The sentence of imprisonment was within the Guidelines range of 12-18 months for Hodge's offense level and criminal history category. At sentencing, Hodge objected to the two-level adjustment for abuse of position of trust.

Hodge has timely appealed his conviction and sentence.

---

[1] The delay between the plea hearing in July 1996 the sentencing hearing in April 2000 occurred because Hodge, who was allowed to return to Japan to be with his wife and child after the first plea hearing, was arrested and served time in a Japanese prison for attempted murder of his mother-in-law.

## II. ANALYSIS

### A. Guilty Plea

Before this court, Hodge argues that he did not knowingly or voluntarily enter a guilty plea because the district court failed to advise him on July 26, 1996, of the particular amount of restitution for which he would be held responsible. Hodge contends that the district court's error affected his decision to plead guilty because "the amount of restitution ordered could actually *increase* the sentencing range used in this case." Appellant's Br. at 13. Accordingly, Hodge argues that "the district court judge should have given Defendant an opportunity to wait until the actual amount of restitution could be determined before his plea was entered, or, in the alternative, allow Defendant to later withdraw his plea." *Id.* at 14. Because the district court's omission is, according to Hodge, a violation of Fed. R. Crim. P. 11, it requires vacation of his guilty plea and a new plea hearing or a trial.

Hodge's conclusion that his substantial rights were violated because the district court failed to advise him of the amount of restitution at issue rests on a false premise, namely that the amount of restitution could affect the length of his sentence. Restitution has no bearing on the term of imprisonment, and we could reject Hodge's challenge to his guilty plea on this basis alone.[2] If construed broadly, however, Hodge's claim of error arguably encompasses two separate claims: first, the district court is required, at the plea colloquy, to inform the defendant of the amount of restitution he must pay if his guilty plea is accepted; and second, the district court must determine the amount of loss attributable to the fraudulent

---

[2]Although Hodge did not present the issue of non-compliance with Rule 11 before the district court, we may still address Hodge's claim on direct appeal. *See United States v. Van Buren*, 804 F.2d 888, 890 (6th Cir. 1986) (holding that defendant may challenge validity of guilty plea on direct appeal even if he did not present this claim to the district court); FED. R. CRIM. P. 32(e) (stating that guilty plea may be set aside on direct appeal).

attempted to verify Hodge's claims for payment, they would have been confronted with the facility's records which Hodge had falsified to facilitate his scheme. If one insurer had not received a tip that Hodge was submitting falsified claims, the insurer could only have uncovered the fraud by interviewing Hodge's patients individually and then comparing their recollections of treatment with Hodge's billing records. Needless to say, Hodge's fraud was made difficult to detect, and was clearly facilitated in a significant way, by his managerial and professional discretion.

Although Hodge's fraud was seemingly simple when compared to that in *Sherman*, in which the doctor created false diagnoses and prescriptions and then covered his tracks by falsifying his patients' progress notes and charts, or in *Iloani*, in which the chiropractor conspired with his patients to defraud the insurance companies, Hodge's fraud is similar to that in *Hoogenboom*. In that case, a psychologist created "activity sheets" of purported therapy sessions which were never held and then provided them to a bookkeeper, who unknowingly filed reimbursement claims for those falsified sessions. *Hoogenboom*, 209 F.3d at 667. Using this method of fraud, Hoogenboom received close to $500,000 from Medicare for services she never rendered. Approving the district court's use of § 3B1.3, the Seventh Circuit held that the psychologist "enjoy[ed] significant discretion and consequently a lack of supervision in determining the type and quality of services that [were] necessary for [her] patients," and that the insurance company was forced to depend on "a presumption of honesty" when reviewing statements it received from her. *Id.* at 671. The same is true of our case. Therefore, we conclude, pursuant to the weight of authority and our case law, that the district court properly applied § 3B1.3 in sentencing Hodge.

## III. CONCLUSION

For the foregoing reasons, Hodge's conviction and sentence are **AFFIRMED**.

72 F.3d 500, 502 (6th Cir. 1996). Insurance companies must, for the most part, assume that health care providers are billing for services that they have actually performed. Because the methods available to insurance companies for assessing whether care providers have been honest — e.g., by reviewing patient charts or facility log books — are limited, billing fraud is hard to detect, and insurance companies must ultimately defer to the health care providers' representations that service was performed. Despite Hodge's argument to the contrary, we do not believe that our holding should be limited to medical doctors and those with equivalent degrees, because the same professional discretion, lack of supervision, and deference may be accorded to a health care provider who lacks an M.D. or Ph.D. but who provides treatment services, such as the instant case, as to those who hold such a degree.

In this case, we believe that Hodge held a position of trust with the insurance companies. He was the founder and manager of the substance abuse treatment facility and he was also a treating therapist there. Although Hodge was ostensibly required to be supervised by the staff psychologist and psychiatrist on certain matters of care, he was able, pursuant to his managerial role, to circumvent their supervision by fraudulently signing his supervisors' names to insurance company forms. On matters of business, he reported to no one. Insurance companies, unable to review exhaustively his claims for purported service, deferred, as they ultimately must, to his managerial and professional judgment when processing his reimbursement claims.

Not only did Hodge occupy a position of trust, but his fraud required him to abuse that trust. As director of Alternatives, he falsified the facility's patient log book, logging therapy sessions for patients whom he had not treated. He also instructed persons, pursuant to his managerial position, to falsify the log book. As we noted earlier, the insurance companies understandably deferred to his professional judgment that the treatment sessions were proper, not to mention that they had actually occurred, when they approved his claims for reimbursement. Had the insurance companies

transactions at issue during the plea colloquy and inform the defendant of his possible sentencing range pursuant to that amount.

As to the first claim, Fed. R. Crim. P. 11 requires the district court, before accepting a plea of guilty, to address the defendant in open court, inform the defendant of, and determine that the defendant understands the following:

> [T]he nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law, including the effect of any special parole or supervised release term, the fact that the court is required to consider any applicable sentencing guidelines but may depart from those guidelines under some circumstances, and, when applicable, that the court may also order the defendant to make restitution to any victim of the offense.

FED. R. CRIM. P. 11(c)(1). Although the government argues that the "District Court, with the assistance of the attorney for the Government, advised the Defendant 'that the Court may also order the Defendant to make restitution to any victim of the offense,'" Appellee's Br. at 7, the transcript of the plea hearing does not bear out this contention. The district court did inform Hodge that if he pleaded guilty:

> [T]he maximum punishment that the statute provides for Count 22 is a period of 5 years in federal prison, a fine of $250,000, a mandatory special assessment of $50.00, and a period of not more than the 3-years supervised release in the event that you are incarcerated, which means parole in other words.

Joint Appendix ("J.A.") at 43. The district court did not mention at this point that Hodge would be subject to a restitution order.

Later in the plea colloquy, the subject of restitution was broached in the context of a discussion about the plea agreement. Attempting to explain the discrepancy between

the amount of loss estimated in the plea agreement for purposes of sentencing — between $10,000 and $20,000 — and the maximum amount of restitution agreed upon by the parties — $112,000 — the government informed the district court that the plea agreement "doesn't say that the restitution is for $112,000. It gives everyone, the defense, the government, and the Court, probation officer, the next several months to work out a firm figure, instead of agreeing — because we have determined that part of that $112,000 was probably adequately supervised by another doctor and another insurance company." J.A. at 55. Thereafter, a conversation ensued between the government and the district court regarding the potential amount of loss attributable to Hodge. While the government's comment mentions the maximum amount of restitution stipulated by the parties, we assume the exchange did not serve to inform Hodge or ensure that he understood that "the court may also order the defendant to make restitution to any victim of the offense," as required by Rule 11(c).

Regardless of the omission by the district court, we have held that failure to discuss a restitution order during the plea colloquy is harmless error, pursuant to Rule 11(h), where the defendant is informed of a possible fine and the restitution order does not exceed the amount of the fine. *United States v. Miller*, 900 F.2d 919, 921 (6th Cir. 1990) (where defendant acknowledges that he may be required to pay $500,000 fine and restitution is ultimately ordered for less than that amount, defendants were not harmed by substitution of restitution for fine). In this case, Hodge was informed by the district court that he could be subject to a fine of $250,000; this amount is clearly in excess of the $14,369 restitution order and $100 fine actually imposed on the defendant. Any error committed by the district court was, therefore, harmless and does not merit a vacation of Hodge's guilty plea. *Cf. United States v. Syal*, 963 F.2d 900, 906 (6th Cir. 1992) (stating that "[s]ubstantial rights may not be affected when a defendant is informed of the maximum penalty and that penalty markedly exceeds the penalty the defendant received").

the honesty of the doctor and is easily taken advantage of if the doctor is not honest"); *United States v. Adam*, 70 F.3d 776, 782 (4th Cir. 1995) (stating that "welfare fraud is terribly difficult to detect because physicians exercise enormous discretion"). These cases are not limited to licensed care providers. *See United States v. Gieger*, 190 F.3d 661, 665 (5th Cir. 1999) (upholding application of § 3B1.3 to ambulance service provider who defrauded Medicare).

Hodge argues that the cases relied upon by the district court all involve physicians and that as a non-physician, he held no position of trust with the insurance companies. The government contends that Hodge is eligible for the adjustment because health care providers who bill such companies are minimally supervised and have considerable discretion. The government rejects Hodge's contention that he should escape responsibility because he was a therapist and manager, not a physician. As the government points out, "[h]ealth care insurance companies rely on honesty from all providers, not just those with a medical license." Appellee's Br. at 13.

We hold today, in accord with the other circuits, that certain health care providers, or persons who hold themselves out as providers of care, occupy a position of trust with respect to both public and private insurance companies if they exercise professional or managerial discretion in treating patients and in billing for those treatments, which discretion is given deference by the insurers and helps to facilitate the crime. Our determination that health care providers may be subject to the § 3B1.3 adjustment is in harmony with our circuit's case law on this adjustment. Our precedents make clear that the touchstone for a finding that the defendant occupies a position of trust is not necessarily the amount of supervision the person receives, although that is an important factor to consider, but rather the amount of discretion the person has in his or her position of employment. *See Brogan*, 238 F.3d at 783; *Tribble*, 206 F.3d at 637 (stating that "the level of discretion accorded an employee is to be the decisive factor in determining whether his position [is] one that can be characterized as a trust position"); *United States v. Ragland*,

an insurance company, the care provider is eligible for this enhancement, and should be given the enhancement. This, to me, makes good sense in that insurance companies trust people in the positions of independent medical and mental health professionals, regardless of whether they are properly licensed or not, and they will — they trust them to bill only for the services that are actually performed. Here the Defendant billed for services that were never performed, and it's a clear abuse of trust, in my opinion.

J.A. at 96-97.

As the district court suggested, several circuits, including the Third, Fourth, Fifth, Seventh, and Ninth, have found that a health care professional provider who defrauds a health care insurance company abuses a position of trust. *See United States v. Hoogenboom*, 209 F.3d 665, 671 (7th Cir. 2000) (psychologist who defrauds Medicare by submitting false documentation of patient services to billing clerk deserves upward adjustment because medical service providers "enjoy significant discretion and consequently a lack of supervision" in treating patients and Medicare must depend "on a presumption of honesty when dealing with statements received from medical professionals"); *United States v. Sherman*, 160 F.3d 967, 970 (3d Cir. 1998) (doctor who defrauds insurance companies by billing for false diagnoses and false courses of treatment and then covers his fraud with falsified records is subject to enhancement because his position allowed him to commit a wrong that was difficult to detect, and insurer relied on, and deferred to, his professional discretion); *United States v. Iloani*, 143 F.3d 921, 923 (5th Cir. 1998) (chiropractor who schemes with patients to defraud private insurers by billing for treatments not performed is subject to adjustment because "insurance companies must rely on physicians' representations that the treatments for which the companies are billed were in fact performed"); *United States v. Rutgard*, 116 F.3d 1270, 1293 (9th Cir. 1997) (ophthalmologist who defrauds Medicare deserves upward adjustment because "the government as insurer depends upon

---

As to the second claim, Hodge challenges the district court's failure to advise him at the plea hearing of the specific amount of loss that would be used to calculate his offense level under the Guidelines. This claim is meritless. It is true that the district court declined to identify at the plea hearing the specific amount of loss that would be used to determine Hodge's sentence. As the government points out, however, the district court need not identify a particular sentencing range under the Guidelines when accepting a guilty plea as long as the defendant is made aware of the maximum potential sentence and the fact that the Guidelines operate to create a sentencing range under the statutory maximum within which the district court may exercise its discretion. *See United States v. Stephens*, 906 F.2d 251, 253-54 (6th Cir. 1990) (upholding district court's denial of motion to withdraw guilty plea where defendant was informed of consequences of guilty plea, knew maximum sentence of imprisonment, and understood that court would sentence defendant according to the Guidelines even though defendant did not know specific Guidelines range to which he was exposed). Indeed, any effort by the district court to determine the amount of loss at the plea colloquy would have been premature, as the district court did not have the benefit of the Presentence Investigation Report's conclusions, which inform the district court's findings for amount of loss.

In this case, it is clear that the district court made Hodge aware that he could receive a sentence of up to five years' imprisonment. The district court also took pains to explain to Hodge how the Sentencing Guidelines are implemented. The court stated that the Guidelines operated to "score criminal activity" by arriving at a "raw number, which number can be adjusted upward or downward, depending upon the specific characteristics of the individual." J.A. at 44. The court then explained how the criminal activity was translated into a sentencing range, depending on the defendant's offense and criminal history. Later, when reviewing the substance of the plea agreement, the district court and the government engaged in a lengthy conversation about how the Guidelines sentencing range would be affected by the amount of loss.

The prosecutor specifically recited the various adjustments that are made to a base offense level depending on the amount of loss attributable to the defendant. The district court then noted that it is the court that ultimately decides the amount of loss, which could be more than the $20,000 to which Hodge had stipulated in his plea agreement but less than $112,000, the total amount of the fraud. In response to a direct question by the district court, Hodge affirmed that he understood that the amount of loss found by the court would determine his offense level at sentencing.

In *Stephens*, this court, in rejecting the defendant's argument that his plea was not knowing or voluntary because he was unaware of the amount of drugs that would be attributable to him for sentencing purposes, stated:

It is obvious that appellant knew the agreement did not guarantee him any particular sentence. It is also clear that he knew the maximum he could be sentenced to . . . was five years. Because appellant was fully aware that his ultimate sentence under the agreement was subject to later determination by the court based on a variety of factors at the time he entered into it, the fact that he did not know specifically that he would be subject to sentencing in the 46-57 month range does not mean that it was entered into unknowingly and unintelligently.

*Stephens*, 906 F.2d at 254. In this case, as in *Stephens*, Hodge knew the maximum sentence he could face; he knew that the district court would sentence him under the Guidelines according to the amount of loss attributable to him; and he recognized that he was not guaranteed a particular sentence. In light of the fact that he clearly knew the consequences of his plea, we reject his claim that the district court violated Rule 11 and that he did not enter into a plea knowingly or voluntarily.

## B. Application of U.S.S.G. § 3B1.3

Hodge's second claim is a challenge to his sentence: he argues that his base offense level was improperly increased by

two levels under U.S.S.G. § 3B1.3 for abuse of a position of trust. We review de novo the decision of a district court to apply U.S.S.G. § 3B1.3 to a defendant's sentence. *United States v. Brogan*, 238 F.3d 780, 783 (6th Cir. 2001); *United States v. Tribble*, 206 F.3d 634, 635 (6th Cir. 2000).

Section 3B1.3 states that "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense, increase by **2** levels." U.S.S.G. § 3B1.3. According to the Guidelines, a position of trust is "characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)." *Id.* cmt. n.1. The person holding such a position is ordinarily "subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." *Id.*

In the instant case, the Presentence Report found that Hodge was able to perpetrate the fraud of billing insurance companies for services not performed by adding patients' names to his agency's appointment book, or directing someone else to do the same, despite the fact that the patients had not been treated by the agency; the appointment book was then used by a billing clerk as a log from which bills were submitted to insurance companies for payment. The Presentence Report concluded that Hodge abused a position of trust because his "professional role as therapist and managerial role at [the substance abuse counseling center] contributed significantly to his ability to commit the offense." J.A. at 153.

The district court, in applying the adjustment, relied on cases from our sister circuits which have held that health care providers who perpetrate health care insurance fraud abuse a position of trust. Addressing Hodge's objection to the enhancement at the sentencing hearing, the district court stated:

The cases stand for the proposition when an independent, professional care provider submits a fraudulent billing to