RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0001p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

　　　　　　　　*Plaintiff-Appellee,*

　　　*v.*

JASON SWEET,

　　　　　　　　*Defendant-Appellant.*

No. 10-3348

_____

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 09-00388-001—James G. Carr, District Judge.

Argued: October 12, 2010

Decided and Filed: January 4, 2011

Before: KETHLEDGE and WHITE, Circuit Judges; BECKWITH, District Judge.[*]

_____

## COUNSEL

**ARGUED:** David E. Mills, THE MILLS LAW OFFICE LLC, Cleveland, Ohio, for Appellant. Thomas A. Karol, ASSISTANT UNITED STATES ATTORNEY, Toledo, Ohio, for Appellee. **ON BRIEF:** David E. Mills, THE MILLS LAW OFFICE LLC, Cleveland, Ohio, for Appellant. Thomas A. Karol, ASSISTANT UNITED STATES ATTORNEY, Toledo, Ohio, for Appellee.

_____

## OPINION

_____

SANDRA S. BECKWITH, District Judge. Jason Sweet appeals the sentence imposed upon him following his guilty plea to one count of bank embezzlement, in violation of 18 U.S.C. § 656. Sweet contends that the district court erred in applying two

---

[*]The Honorable Sandra S. Beckwith, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

enhancements set forth in the Sentencing Guidelines in imposing his sentence. We vacate and remand to the district court for re-sentencing.

I.     BACKGROUND

Sweet worked for National City Bank in Toledo, Ohio as a "Customer Service Lead" bank teller. The bank has two levels of tellers, the lowest of which is called "Customer Service Representative" ("CSR"). Sweet's position entailed additional responsibilities beyond those given to CSR's. Sweet testified that he was a "first line of support" for the other tellers. He performed cash audits and random cash audits; engaged in daily spontaneous teller coaching; reviewed teller books weekly; maintained the official check mail order; and he was occasionally responsible for completing the end-of-night checklist for his branch. (R.19, Sent. Tr. 51-53)

National City assigns each of its bank tellers a personal combination to gain access to the teller's vault where cash is stored. Each teller has a separate vault cash drawer, and the bank maintains a computerized system to track the money moving in and out of the vault and its cash drawers. At the end of day, when each teller returns cash to his or her vault, the teller's balance tally must match the computerized tally. Tellers "audit" each others' cash drawers by counting the cash to verify the correct balance. Sweet regularly "audited" other tellers' cash drawers in this fashion, including situations when a teller experienced a cash shortage, or to perform what Sweet described as "random" audits.

After Sweet started working for the bank in November 2008, a number of tellers experienced cash shortages. An internal investigation revealed that the shortages all occurred on days that Sweet had been working. Sweet was terminated from his job in March 2009 for unrelated reasons, although at that time the bank's investigator suspected that Sweet was responsible for the cash shortages. FBI agents interviewed Sweet on July 7, 2009, and at first Sweet denied any involvement in the shortages. He agreed to take a polygraph test on the spot, the results of which indicated he was not being truthful. Sweet then changed his story and admitted that he stole between nine and ten thousand dollars, by watching other tellers open their cash drawers and memorizing

their personal access codes.  Sweet signed a written statement the same day, admitting that he had memorized other tellers' combinations.

Sweet agreed to plead guilty without a written plea agreement.  At Sweet's change-of-plea hearing, the Government recited the elements of the offense and the evidence that the Government was prepared to prove.  That recitation included the statement that Sweet embezzled money while he was "involved in audits of other bank tellers.  He would look over the shoulders of the other bank tellers as they were going to put in their ... vault code."  (R. 10, at 19)  Sweet objected to the Government's recitation of the case only with respect to the total amount of money he embezzled, and the frequency of his thefts.  According to the pre-sentence report ("PSR"), Sweet told the probation officer that while he audited other tellers' vault drawers, he learned their personal vault codes which he then used to gain access to their drawers and steal money. The probation officer accepted the Government's loss calculation, and recommended that Sweet's offense level be increased pursuant to Guidelines Section 3B1.3, based on Sweet's abuse of a position of trust.   With a two-level reduction for acceptance of responsibility, Sweet's total offense level was 11, yielding an advisory Guidelines sentencing range of 8 to 14 months. Sweet objected to both the loss calculation and the Section 3B1.3 enhancement, but did not object to the PSR's description of his offense conduct.

At Sweet's sentencing hearing, an FBI agent testified that Sweet admitted that he obtained the vault codes during cash audits.  Sandra Beavers, the bank's fraud investigator, testified that Sweet had "a little bit more responsibilities than a customer service rep, which ... is what we knew as a teller.  Part of [Sweet's] responsibilities would be to do audits if someone else was short."  (Sent. Tr. 23)  Beavers also testified that Sweet would accompany tellers into the cash vault only to do an audit, and that he would have to sign a cash-settlement sheet confirming that the audit had been done. Sweet testified that he obtained the vault codes by simply following other tellers when they entered the vault and watching them enter their codes.  He stated that he would "wait until the bank was slow, watch for someone else to need to go to the back vault,

go with them at the same time, and engage them in conversation while I watched them put their combination into the bank vault." (*Id.* at 35) Sweet specifically denied obtaining any combination while performing audits, claiming that it would have been impossible for him to do so. (*Id.* at 43, 49) Sweet said that he took money from the other tellers' drawers in bundled packets of bills ($500 or $1,000), and calculated that he stole a total of $10,000.

The district court noted that the question of loss amount was "extremely close," and credited Sweet's testimony that he stole $10,000. (*Id.* at 92) This finding reduced his offense level by two. The district court overruled Sweet's objection to the two-level increase for abuse of trust, finding that Sweet had been given the responsibility to perform audits of other tellers. To that extent, the court found that Sweet was not "the ordinary and conventional teller" who would not be subject to Section 3B1.3. (*Id.* at 93) The district court also found that Sweet had lied during his sentencing testimony when he denied that he obtained the vault codes during audits. The district court granted the Government's request for a two-level enhancement for obstruction of justice based on Sweet's perjury. (*Id.* at 94-96) Sweet was sentenced to eight months, the low end of the resulting advisory Guideline range, five years supervised release, and ordered to pay restitution.

Sweet timely appealed his sentence, and the district court granted his motion for release pending appeal, noting that the relative brevity of the sentence posed a risk that it would be served before Sweet's appeal was decided. The district court also noted the "possibility that the Circuit might disagree with my findings." (R. 31) Sweet contends that the district court's application of both of the enhancements was error.

II.     STANDARD OF REVIEW

The district court's application of Guidelines Section 3B1.3 is a question of law, which this Court reviews de novo.  *United States v. Brogan*, 238 F.3d 780, 783 (6th Cir. 2001).

The district court's factual determinations concerning the application of an obstruction of justice enhancement are reviewed for clear error.  *United States v. Goosby*, 523 F.3d 632, 639 (6th Cir. 2008).  The decision that Sweet's conduct amounted to obstruction of justice under the Guidelines, and the application of that enhancement, are reviewed de novo.  *United States v. Baggett*, 342 F.3d 536, 541 (6th Cir. 2003).

III.    ANALYSIS

A.      **Abuse-of-Trust Enhancement**

Guidelines Section 3B1.3, the "abuse of trust" enhancement, provides for an increase in offense level if the defendant abused a position of public or private trust that significantly facilitated the commission or concealment of the offense.  Application Note 1 defines a position of "public or private trust" as one that is

> . . . characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference).  Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.

Examples of such conduct provided in Note 1 include an attorney serving as a guardian who embezzles a client's funds, and a bank executive's fraudulent loan scheme.  The Application Note also states: "This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors."

Sweet contends that the district court erred in concluding that he was more than "an ordinary bank teller" and imposing this enhancement.  He argues that he obtained the access codes in a way that any other teller could have done, simply by looking over

a teller's shoulder when the teller dialed the access code. Sweet relies on *United States v. Humphrey*, 279 F.3d 372 (6th Cir. 2002), where the defendant was a bank and vault teller for SunTrust Bank, and acted as head teller for ten branch offices. Her responsibilities included counting the contents of the bank vault, and handling cash and food stamp transactions with the Federal Reserve Bank. Discrepancies in the bank's food stamp shipment records led to the bank's discovery that Humphrey had embezzled over $500,000 in cash. A jury found her guilty, and at sentencing, the district court applied an abuse-of-trust enhancement. This Court vacated and remanded for re-sentencing, citing *United States v. Hodge*, 259 F.3d 549, 556 (6th Cir. 2001), and noting that it is the level of discretion the employee exercises in his or her position, not the amount of supervision exercised over that employee, that is the touchstone for application of the enhancement. Humphrey, the bank's vault teller, fell somewhere between an ordinary bank teller and a bank executive, the two positions exemplified in the Application Note. While it was undisputed that Humphrey had little or no direct supervision at her job, the Court found that "she was not authorized to exercise substantial professional or managerial discretion in her position." *Humphrey*, 279 F.3d at 381. She took advantage of her seniority to control cash counts and handle food stamps, but was not in a trust relationship with the bank, such that she could "administer its property or otherwise act in its best interest." *Id.* (footnote omitted).

*Humphrey* also cited *United States v. Ragland*, 72 F.3d 500 (6th Cir. 1996), and *United States v. Brogan*, 238 F.3d 780 (6th Cir. 2001), both of which addressed application of Section 3B1.3. In *Ragland*, a bank teller, paid by customers buying certificates of deposit, forged bank officers' signatures on those certificates. The teller lacked authority to issue bank certificates, but using forgeries she managed to steal over a million dollars. This Court found that her position did not warrant application of the enhancement. And in *Brogan*, the defendant was an assistant corporate treasurer whose job duties included setting up and formatting corporate wire transfers. Four of his supervisors had the authority to execute wire transfers. The defendant prepared an $8 million request payable to a phony corporation, gave it to his supervisor for approval, and then transferred the money to his personal account. This Court reversed the district

court's application of the enhancement, finding that the district court had improperly considered "... what in fact happened, rather than inquiring into 'the inherent nature of the work' Brogan performed and the discretion he was accorded in his position." *Brogan*, 238 F.3d at 784. Brogan lacked the authority to transfer any funds without a supervisor's approval; the fact that Brogan was lightly supervised, or that the company used lax auditing procedures, did not support application of the enhancement. The Court also noted the crucial distinction between employees who "handle" an employer's property, and those who "administer" that property, as only the latter merit application of the sentencing enhancement: ". . . the rationale for the sentencing enhancement is akin to punishment for violating a fiduciary duty, a higher duty than the ordinary one placed on all employees and breached by conversion." *Id.* at 783 (citing *Ragland*, 72 F.3d at 503).

In *United States v. Tribble*, 206 F.3d 634 (6th Cir. 2000), a postal-service window clerk embezzled funds by voiding receipt of customers' checks using the post office computer system to cover up his cash thefts. This Court concluded that the defendant's system of embezzling funds was no more advanced than a typical bank teller who had access to a bank's computer system. A postal window clerk is essentially a clerical position, and is not in a fiduciary or managerial relationship with the postal service.

Sweet argues that the focus of the Government and the district court on the precise manner in which he obtained other tellers' access codes is irrelevant, because he was not the bank's fiduciary and he lacked authority to administer the bank's property. He suggests that the term "audit" overstates the function of what he described as "cash audits," which are simply a means to cross-check a teller's balance.

We agree that the district court erred when it applied Section 3B1.3 to calculate the advisory Guidelines sentencing range. Sweet's position, slightly above that of a regular bank teller, had less managerial discretion and responsibility than did the defendant's position in *Humphrey*. Like the defendants in *Humphrey*, *Brogan*, and *Tribble*, Sweet clearly took advantage of his position to expropriate other tellers' vault

access codes.  But, as *Humphrey* makes clear, the question is not the amount of supervision Sweet received; rather, the critical question is whether Sweet was given **substantial** professional or managerial discretion in his position.  We find that Sweet's position did not entail more than the normal duties of honesty and fealty imposed on all employees.  The fact that Sweet was entrusted to "audit" other tellers' cash drawers, or to certify the existence of a teller's cash shortage, is not the type of substantial discretion to manage the bank's funds that is required for the application of the abuse-of-trust enhancement.

B.      **Obstruction-of-Justice Enhancement**

In applying a sentencing enhancement under Guidelines Section 3C1.1 for obstruction of justice, the district court found that it could not "square" Sweet's statements to the probation officer and the FBI agent that he had obtained the vault codes during audits, with his outright denial of that fact during his sentencing hearing testimony.  The district court observed  that the meaning of the word "audit" did not include casual visits to the vault with other tellers, as Sweet claimed in his testimony.  (Sent. Tr. 95-96)  The district court concluded that Sweet had obstructed justice and increased his offense level by two.

Guidelines Section 3C1.1 states:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

Application Note 4 to this section provides examples of covered conduct, including perjury that pertains to conduct that forms the basis of the conviction, or providing materially false information to a judge or magistrate.  Application Note 2 cautions that, in weighing alleged false testimony from a defendant, "the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake,

or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice."

In *United States v. Boring*, 557 F.3d 707, 712 (6th Cir. 2009), this Court articulated the requirements for the proper application of Section 3C1.1:

> For a district court to impose an obstruction-of-justice enhancement to a defendant's sentence under § 3C1.1 of the Sentencing Guidelines, the court must 1) identify those particular portions of defendant's testimony that it considers to be perjurious; and 2) either make a specific finding for each element of perjury or, at least, make a finding that encompasses all of the factual predicates for a finding of perjury. ... The elements of perjury are false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.   [Internal citations and quotations omitted].

FBI Agent Mattei testified at sentencing that during the July 7, 2009 interview, Sweet admitted that his scheme started with a teller named Alisha Clark, when Sweet said he "did a random audit on her." (Sent. Tr. 72)  During the change-of-plea hearing, Sweet did not contest the Government's recitation of the fact that he obtained vault codes during teller audits. He also did not object to that description of his conduct in the pre-sentence report.  Sweet was well aware that the probation officer's recommendation concerning the abuse of trust enhancement was based upon the facts concerning audits. It was only during his sentencing testimony that Sweet first denied these facts and claimed he obtained the codes casually, as any teller would have been able to do.

It was clear that the purpose of the evidentiary sentencing hearing was to resolve Sweet's objections to the pre-sentence report as to the amount of loss and as to the abuse of trust enhancement.  The district court succinctly framed the latter issue at the start of the hearing, stating: "I think what I want to know is how much trust really was placed in [Sweet's] hands. ... I think ultimately the question is whether by virtue of his assigned duties he routinely, ordinarily, would stand behind the teller as a teller would open a vault ..., or was it something where he just kind of wandered over and took advantage of the geography, as it were." (*Id.* at 3, 4)  Sweet's sentencing hearing testimony concerning the audits and access to vault codes directly contradicted his earlier

statements on this issue.  He attempted to place himself within the district court's articulation of the issue - he just "wandered over" into the vault with other tellers.

The district court did not expressly use the word "perjury" in its findings. However, the court concluded that Sweet ". . . rather vigorously denied any acquisition of these numbers and thereby gaining access that enabled him to commit these thefts during the course of an audit, that in the face of twice having told first the agent then the [probation] officer something to the contrary." (*Id.* at 94)  The prosecutor began to respond, noting that Sweet did not claim that his "memory has changed from July...," when the district court immediately agreed with the statement, finding he could not "square" Sweet's different stories. (*Id.* at 95)  The district court clearly rejected any innocent explanation, such as mistake or faulty memory, and agreed with the government that Sweet had perjured himself at the sentencing hearing.  The district court's factual determination that Sweet was lying is not clearly erroneous.

Sweet also argues that the method by which he obtained the access codes, whether in the course of "audits" or more casually, is not a material matter, rendering application of the enhancement improper.  He notes that he admitted that he embezzled the money by surreptitiously obtaining vault codes, and that the specific manner in which he did so is irrelevant to the elements of embezzlement.  He cites *United States v. Jones*, 159 F.3d 969, 981 (6th Cir. 1998), in which this Court reversed application of the enhancement based on the defendant's testimony at sentencing.  That case does not assist Sweet.  There, the defendant was convicted by a jury on multiple felony drug and firearms counts.  The alleged perjury was defendant's sentencing testimony that the arresting officers were wearing tee-shirts containing a racial slur.  The tee-shirts were extremely offensive and highly objectionable in other respects, drawing sharp rebukes from both the district court and from this Court.  However, the shirts did not contain a racial slur when the district court examined the shirts.  The issue whether a slur was on the shirts was not material to any issue regarding the offenses of conviction or to sentencing.  This Court noted that perjurious testimony at sentencing must be "material and nontrivial.  . . .  A false statement made at a sentencing hearing regarding

information that is relevant to sentencing is material and nontrivial for purposes of § 3C1.1." *Id.* at 981, (quoting *United States v. Aideyan*, 11 F.3d 74, 76 (6th Cir. 1993)).

The Government contends that Sweet's testimony was clearly material and nontrivial for purpose of sentencing. It cites *United States v. Gibbs*, No. 95-2215, 1996 WL 382267, 1996 U.S. App. LEXIS 19147, at *2-4 (6th Cir. 1996) (unpublished table case), involving an arson defendant's perjured testimony about the specific manner in which he set the fire. This Court found that "lying for the purpose of obtaining a lighter sentence constitutes obstruction of justice within the meaning of § 3C1.1." *Id.* at *6, (quoting *United States v. Flores*, 959 F.2d 83, 86 (8th Cir. 1992)) (alteration in *Gibbs*). We agree. Sweet's testimony was calculated to avoid application of the Section 3B1.1 enhancement and an attempt to minimize the seriousness of his conduct. The district court's application of Section 3C1.1 in calculating Sweet's advisory Guidelines range is affirmed.

IV.     CONCLUSION

The district court erred in finding that Guidelines § 3B1.1, the abuse-of-trust enhancement, applied to Sweet. As the district court's decision with respect to Section 3C1.1, obstruction of justice, was not clearly erroneous, we do not disturb that finding. Sweet's sentence is vacated, and this matter is remanded to the district court for re-sentencing.