**UNITED STATES, Plaintiff,**

v.

**Marilyn A. COLEMAN,
et al., Defendants.**

No. CR–2–02–130(1), (2), (3).

United States District Court,
S.D. Ohio,
Eastern Division.

May 24, 2005.

Deborah A. Solove, United States Attorney, Columbus, OH, for Plaintiff.

Max Kravitz, Paula Milsom Brown, Kravitz, Gatterdam & Brown, LLC, Thomas Michael Tyack, Tyack Blackmore & Liston Co. LPA, Kort Walter Gatterdam, Kravitz, Gatterdam & Brown, LLC, Columbus, OH, for Defendants.

## *SENTENCING MEMORANDUM*

MARBLEY, District Judge.

### I. INTRODUCTION

The Defendants, Marilyn A. Coleman, Mitchell V. Kaminski, and Ovimmune, Inc., came before the Court for sentencing on April 29, 2005. The Court found that Defendants Coleman and Kaminski had a to-

tal offense level of 10 and a Criminal History Category of I, resulting in a guideline imprisonment range of 6–to–12 months. The Court sentenced both Defendants to a term of probation of five years, which includes six months of confinement at a community treatment center, with work-release only, and 6 months of home confinement, which may include electronic monitoring. The Court ordered each Defendant to pay a fine of $6,000 and a special assessment of $375. In addition, all Defendants were found jointly and severally liable for restitution in the amount of $33,604.12. The Court stayed Ovimmune's sentence for sixty days pending resolution of certain matters.[1] In addition to outlining the sentences imposed, this Sentencing Memorandum addresses this Court's post-*Booker* approach to sentencing enhancements.

## II. BACKGROUND AND FACTS

### A. Trial

In a 23 count Superseding Indictment, the government charged Defendants Marilyn A. Coleman ("Coleman"), Mitchell V. Kaminski ("Kaminski"), and Ovimmune, Inc. ("Ovimmune"), with one count of conspiracy, seven counts of mail fraud, and fifteen counts for violations of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq. ("FDCA"). At the time of the Superceding Indictment, Defendants Coleman and Kaminski were the only active officers of the Ovimmune corporation and, together, were co-owners of the corporation.[2]

The charges were based on the Defendants' manufacture of "hyperimmune" egg products, which they allegedly sold as

treatment for a variety of human diseases. These egg products were manufactured by specially vaccinating chickens, then treating the chickens' eggs to create products referred to, *inter alia*, as "anti-chlamydia egg powder," "anti-candida egg powder," and "Candida Rx." The theory was that the vaccinated chickens would create antibodies that would cause their eggs to be useful in treating disease. The vaccines were transported in interstate commerce. The egg products were manufactured by treating the eggs in the basement of Defendant Coleman's home, which was listed as the business address for Defendant Ovimmune. One baggie of egg powder often sold for more than $200.

On August 15, 2002, Defendants Coleman and Kaminski were arraigned and entered pleas of not guilty. The Defendants denied all of the government's allegations, claiming: (1) their products were not drugs; (2) they lacked the criminal intent necessary under federal law; and (3) they acted in reasonable reliance on the government's assertions that their conduct was lawful. The trial began June 23, 2003, and lasted nineteen days. After four days of deliberations, on July 23, 2003, the jury reached a verdict.

The jury found all three Defendants not guilty of the crime of conspiracy in violation of 18 U.S.C. § 371 as charged in Count 1 of the Superseding Indictment and not guilty of the crimes of mail fraud in violation of 18 U.S.C. §§ 2 and 1341 as charged in Counts 2 through 8. As to Counts 9 through 13, introduction into interstate commerce of unapproved new drugs in violation of 21 U.S.C. §§ 331(d), 355(a) and 333(a)(2) and 18 U.S.C. § 2, the

---

**1.** Ovimmune's sentence is not contained in this Sentencing Memorandum. The Court stayed Ovimmune's sentence until July 1, 2005 to provide the company with extra time to research any legally sound method for dis-

posing of 49,000 pounds of egg powder currently being stored in Pennsylvania.

**2.** At the sentencing hearing, Defendant Kaminski informed the Court that he is no longer affiliated with Ovimmune in any way.

jury found that the Defendants did not have the intent to defraud or mislead required for felony violations, but did find them guilty of the lesser included offenses of introduction into interstate commerce of unapproved new drugs without intent to defraud or mislead, misdemeanor offenses.

As to Counts 14 through 17, introduction of misbranded drugs into interstate commerce in violation of 21 U.S.C. §§ 331(a) and 333(a)(2) and 18 U.S.C. § 2, the jury found that the Defendants did not have the intent to defraud or mislead required to find felony violations, but found them guilty of the lesser included offenses of introduction into interstate commerce of misbranded drugs without intent to defraud or mislead, misdemeanor offenses. The jury specifically found "misbranding" by virtue of the fact both that (1) the product's labeling did not bear adequate directions for use, and (2) the product was manufactured, prepared, propagated, compounded, or processed in an establishment in any state not duly registered with the Food and Drug Administration ("FDA").

As to Count 18, failure to register a drug manufacturing facility in violation of 21 U.S.C. §§ 331(p) and 333(a)(2) and 18 U.S.C. § 2, the jury found that the Defendants did not have the intent to defraud or mislead required to find a felony violation, but found them guilty of the lesser included offense of failure to register a drug manufacturing facility without intent to defraud or mislead, a misdemeanor.

As to Counts 19 through 21, misbranding drugs while held for sale after shipment in interstate commerce in violation of 21 U.S.C. §§ 331(k) and 333(a)(2) and 18 U.S.C. § 2, the jury found that the Defendants did not have the intent to defraud or mislead required to find felony violations, but did find them guilty of the lesser included offenses of misbranding drugs while held for sale after shipment in interstate commerce without intent to defraud or mislead, misdemeanor offenses.

The jury found the Defendants guilty as charged in Counts 22 and 23, adulterating drugs in violation of 21 U.S.C. §§ 331(k) and 333(a)(1) and 18 U.S.C. § 2. The jury specifically found "adulteration" by virtue of the fact that (1) the product was prepared, packed, or held under unsanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health, and (2) the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding did not conform to or were not operated or administered in conformity with current good manufacturing practice.

### B. Sentencing

In the presentence investigation report, ("PIR"), prepared on October 22, 2003, the probation officer calculated the applicable guideline range under the United States Sentencing Guidelines ("U.S.S.G.") for Defendants Coleman and Kaminski under the 2000 edition of the *United States Sentencing Guidelines Manual.* PIR at ¶ 48. The PIR first explained that all five counts would be grouped together under 3D1.2(d), which provides that "[c]ounts involve substantially the same harm ... when the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior." *Id.* The PIR found a base offense level of 6 under U.S.S.G. § 2N2.1,[3] which covers violations of statutes dealing with any food, drug, biological product, device, cosmetic

---

3. U.S.S.G. § 2N2.1 reads as follows:
 *Violations of Statutes and Regulations Dealing With Any Food, Drug, Biological Prod-*

*uct, Device, Cosmetic, or Agricultural Product*
(a) Base Offense Level: 6

or agricultural product. PIR at ¶ 50. The PIR then explained that because this case involved fraud, the fraud cross-reference in § 2N2.1(b)(1) should apply, meaning that § 2F1.1 must also be utilized in determining the appropriate sentence. PIR at ¶ 50. Turning to § 2F1.1, the PIR added 7 levels to the base offense (for a preliminary total of 13) because the "total monetary loss to the individual and corporate victims is $128,907.68." *See* U.S.S.G. § 2F1.1(b)(1)(H) (adding 7 levels for any loss exceeding $120,000). PIR at ¶ 51.[4] The PIR then added 2 levels pursuant to § 2F2.1(b)(2) because the offense involved a scheme to defraud more than one victim, and added another 2 levels because, under § 3B1.3, Defendants Kaminski and Coleman both abused a position of public or private trust, or used a special skill in any manner that significantly facilitated the commission or concealment of the offenses. PIR at ¶¶ 52, 54. Finally, the PIR added 2 levels for each Defendant for obstruction of justice. PIR at ¶¶ 55–56. Neither Defendant received an adjustment for acceptance of responsibility pursuant to § 3E1.1 because each Defendant proceeded to trial and attempted to obstruct justice. PIR at ¶ 57. Thus, each Defendant had a total offense level of 19 with a Criminal History Category of I, resulting in a guideline imprisonment range of 30–to–37 months.

Both the government and Defendants objected extensively to the probation officer's conclusions. In response to these objections, the probation department issued an addendum to the PIR on January 28, 2005, which addressed seven substantive objections from Defendants and two substantive objections from the government. Defendant Coleman submitted four additional sentencing memoranda between April 5, 2005 and April 28, 2005. Likewise, Defendant Kaminski submitted an additional sentencing memorandum on April 26, 2005. The government responded accordingly. These filings focused primarily on the impact, if any, that the Supreme Court's decision in *United States v. Booker*, ––– U.S. –––, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) would have on each Defendant's sentence.

## III. ANALYSIS

As Defendants pointed out in their voluminous filings, the post-*Booker* world has raised several novel legal issues. In *Booker*, Justice Stevens, writing for the constitutional majority of the Court, found that the Sixth Amendment was violated when an enhanced sentence was imposed under a mandatory sentencing guideline regime based on a sentencing judge's determination, as opposed to a jury's determination.[5] *Booker*, 125 S.Ct. at 756 ("Accordingly, we

---

(b) Cross References
(1) If the offense involved fraud, apply § 2F1.1 (Fraud and Deceit).
(2) If the offense was committed in furtherance of, or to conceal, an offense covered by another offense guideline, apply that other offense guideline if the resulting offense level is greater than that determined above.

*Id.*

4. In pertinent part, § 2F1.1 provides as follows:

*Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States*

(a) Base Offense Level: 6
(b) Specific Offense Characteristics
(1) If the loss exceeded $2,000, increase the offense level as follows: [providing that an increase of 7 levels is warranted for a loss of more than $120,000]
(2) If the offense involved (A) more than minimal planning, or (B) a scheme to defraud more than one victim, increase by 2 levels.

*Id.*

5. The facts in *Booker* are as follows:

The jury found him guilty of possessing at least 50 grams of crack cocaine, based on evidence that he had 92.5 grams. Under those facts, the Guidelines required a possi-

reaffirm our holding in *Apprendi:* Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."). In a separate majority opinion, the so-called "remedial majority opinion," Justice Breyer remedied this constitutional violation by severing certain portions of the Sentencing Guidelines, thus making them advisory.[6] Justice Breyer concluded

that district courts are no longer bound by the Guidelines, but that district courts must "take them into account when sentencing." *Id.* at 767. The remedial portion of *Booker* also explained that a district court's sentencing determination would be reviewed under the standard of "reasonableness," as determined by 18 U.S.C. § 3553(a) and the factors set forth within. *Id.* at 766. *Booker* and its progeny have made clear that 18 U.S.C. 3553(a), which provides a list of factors to be considered during sentencing,[7] "remains binding on

---

ble 210–to–262–month sentence. To reach Booker's actual sentence—which was almost 10 years longer-the judge found that he possessed an additional 566 grams of crack. Although, the jury never heard any such evidence, the judge found it to be true by a preponderance of the evidence. *Booker,* 125 S.Ct. at 742.

**6.** *Booker* excised 18 U.S.C. § 3553(b)(1) (making mandatory the Guidelines) and 18 U.S.C. § 3742(e) (setting forth standards of review on appeal). *Booker,* 125 S.Ct. at 765.

Title 18 U.S.C. § 3553(b)(1) required "a sentence of the kind, and within the range" prescribed by the Guidelines "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration." Title 18 U.S.C. § 3742(e)(1)(2) required circuit courts to determine whether the sentencing court had imposed a sentence in violation of law or "as a result of an incorrect application of the sentencing guidelines." Subsection (3) required the appellate court to vacate a sentence that was outside the applicable range if, *inter alia,* the district court failed to provide a written statement of reasons, departed based on a factor that did not advance the objectives set forth in section 3553(a)(2), or departed "to an unreasonable degree" from the range.

**7.** 18 U.S.C. § 3553(a) states:

(a) Factors to be considered in imposing a sentence.—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
 (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
 (B) to afford adequate deterrence to criminal conduct;
 (C) to protect the public from further crimes of the defendant; and
 (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for-
 (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—(i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or
 (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to

the federal courts." *United States v. Oliver*, 397 F.3d 369, 381 (6th Cir.2005). One of these factors, found in 3553(a)(4), "instructs sentencing courts to consider the applicable federal sentencing guideline range when determining the appropriate sentence." *Oliver*, 397 F.3d at 381; *see* 18 U.S.C. § 3553(a)(4) ("The court, in determining the particular sentence to be imposed, shall consider ... the kinds of sentence and the sentencing range for ... the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines....").

Thus, at sentencing, this Court will begin its determination by considering the applicable Guideline range as recommended by the probation officer's report. The Court will then consider all parties' objections and resolve any relevant factual disputes, utilizing the preponderance of the evidence standard for sentencing enhancements. The Court, as discussed below, will no longer consider acquitted conduct when making a sentencing determination. Upon determining which enhancements apply, the Court will then evaluate the rest of the factors set forth in 18 U.S.C. § 3553(a)(1)-(7).

### A. Standard of Proof for Enhancements

In interpreting the practical effects of the two majority opinions in *Booker*, most courts agree that judicial fact-finding may be made by a preponderance of the evidence so long as the court is operating in an advisory regime. *See Booker*, 125 S.Ct. at 750 ("If the Guidelines as currently written could be read merely as advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment."); *see also United States v. Yagar*, 404 F.3d 967, 972 (6th Cir.2005) ("[A] finding under the Guidelines must be based on reliable information and a preponderance of the evidence...."); *Cirilo–Munoz v. United States*, 404 F.3d 527, 532–33 (1st Cir.2005) (holding that the court's finding of an enhancement based on a preponderance of the evidence was not in error because *"Booker* has preserved the use of judge-made findings by directing that the guidelines hereafter be treated as advisory rather than mandatory ..."); *Guzman v. United States*, 404 F.3d 139, 143 (2d Cir.2005) (agreeing with the proposition set forth in *McReynolds v. United States*, 397 F.3d 479, 481 (7th Cir.2005), that "the remedial portion of *Booker* held that decisions about sentencing factors will continue to be made by judges, on the preponderance of the evidence"); *United States v. Mares*, 402 F.3d 511, 519 (5th Cir.2005) ("The sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of the Guideline sentencing range and all facts relevant to the determination of a

be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

(5) any pertinent policy statement—

(A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

*Id.*

non-Guidelines sentence."); *McReynolds,* 397 F.3d at 481 ("The remedial portion of *Booker* held that decisions about sentencing factors will continue to be made by judges, on the preponderance of the evidence, an approach that comports with the Sixth Amendment so long as the guideline system has some flexibility in application.").

This Court believes that all enhancements should be determined by beyond a reasonable doubt,[8] but, in light of *Yagar's* dicta and the multi-circuit consensus, the Court will continue to review enhancements, with the exception of those relating to acquitted conduct,[9] by a preponderance of the evidence. *Yagar,* 404 F.3d at 972 ("Because a finding under the Guidelines must be based on reliable information and a preponderance of the evidence, *see* U.S.S.G. § 6A1.3, commentary, we hold that the district court did not have a proper factual basis to apply an enhancement under section 2B1.1(b)(2)(A).").[10]

## B. Consideration of Acquitted Conduct

 At sentencing, acquitted conduct should always be considered using a reasonable doubt standard; otherwise, a defendant's Sixth Amendment right to a jury trial is eviscerated. Typically, a defendant is found guilty of certain conduct under the beyond a reasonable doubt standard. At sentencing, the prosecution is then permitted to use this same conduct, considered now using the lower preponderance

**8.** The Court finds that the beyond a reasonable doubt standard reflects the seriousness of the determinations made within the criminal justice system, as opposed to the civil system. *See United States v. Gray,* 362 F.Supp.2d 714, 720 (S.D.W.Va.2005) ("In a civil action that only involves monetary damages, 'we view it as no more serious in general for there to be an erroneous verdict in the defendant's favor than for there to be an erroneous verdict in the plaintiff's favor,' and accordingly it 'seems peculiarly appropriate' to apply a preponderance standard.)" *Id.* at (citing *In re Winship,* 397 U.S. 358, 370–71, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring)). By contrast, "in criminal matters 'we do not view the social disutility of convicting an innocent man as equivalent to the disutility of acquitting someone who is guilty.' " *Id.*
To the extent that an enhancement detracts from a defendant's liberty, its imposition should be considered with extreme scrutiny. *Gray,* 362 F.Supp.2d at 723 ("Although the phrases 'preponderance of the evidence' and 'proof beyond a reasonable doubt' are quantitatively imprecise, they do communicate to the finder of fact different notions concerning the degree of confidence he is expected to have in the correctness of his factual conclusions.") (citing *Winship,* 397 U.S. at 370, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring)); *United States v. Pimental,* 367 F.Supp.2d 143, 150–51, 154, 2005 WL 958245, at *6, *8 (D.Mass.2005) (finding the

Fifth Amendment requires application of the beyond a reasonable doubt standard to enhancements because each judicial finding of fact has "quantifiable consequences" on the defendant's sentence); *see also United States v. Huerta–Rodriguez,* 355 F.Supp.2d 1019, 1027 (D.Neb.2005) (" [T]his court will require that a defendant is afforded procedural protections under the Fifth and Sixth Amendments in connection with any facts on which the government seeks to rely to increase a defendant's sentence.").

**9.** *See* Section B, *infra,* as to this Court's reasoning why acquitted conduct must be viewed pursuant to a reasonable doubt standard.

**10.** U.S.S.G. § 6A1.3 reads:
When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor. In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy. *Id.* (citing 18 U.S.C. § 3661 and *United States v. Watts,* 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997)).

of the evidence standard, to enhance that defendant's sentence. This "theoretical contradiction" [11] is exemplified in the case sub judice where, notwithstanding the jury's finding of not guilty on seven counts of mail fraud and the jury's finding that Defendants did not have the intent to defraud or mislead on thirteen counts, the government urges this Court to apply the fraud cross-reference found in U.S.S.G. § 2N2.1,[12] which would add at least 6 additional offense levels.

The government argues that, under *United States v. Watts*, the fraud enhancement is proper if this Court finds that the government successfully proved fraud by a preponderance of the evidence. *United States v. Watts*, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997). In *Watts*, the Supreme Court addressed whether, under the mandatory sentencing guideline regime, a sentencing judge could consider conduct of which the defendant had been acquitted at trial, using a preponderance of the evidence standard. There, the district court had found, "by a preponderance of the evidence," that the defendant had possessed guns in connection with the drug offense and added two points to his sentence, even though the jury had acquitted him of using a firearm in relation to a drug offense. *Id.* at 150, 117 S.Ct. 633. The Supreme Court found "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *Id.* at 157, 117 S.Ct. 633. The viability of *Watts*, however, was questioned by Justice Stevens' constitutional majority opinion in *Booker*. While stating that *Watts* is not "inconsistent with today's

decision," Justice Stevens remarked that *Watts* did not involve "any contention that the sentencing enhancement had exceeded the sentence authorized by the jury verdict in violation of the Sixth Amendment. The issue we confront today simply was not presented." *Booker*, 125 S.Ct. at 754. Moreover, in a footnote, Justice Stevens continued: "*Watts*, in particular, presented a very narrow question regarding the interaction of the Guidelines with the Double Jeopardy Clause, and did not even have the benefit of a full briefing or oral argument. It is unsurprising that we failed to consider fully the issues presented to us in these cases." *Id.* at 754 n. 4. *See also United States v. Gray*, 362 F.Supp.2d 714, 721 (S.D.W.Va.2005) ("The reasoning in *Watts* ... was drawn into serious question by the constitutional majority in *Booker*."); *United States v. Pimental*, 367 F.Supp.2d at 150–51, 2005 WL 958245, at *6 (D.Mass. Apr.21, 2005) (characterizing Justice Stevens' language as questioning *Watts*' underlying proposition).

■ As a threshold matter, this Court finds that the government, in the case sub judice, failed to prove mail fraud (charged in Counts Two through Eight) or intent to defraud or mislead (charged in Counts Nine through Twenty-one) by *either* a preponderance of the evidence or by proof beyond a reasonable doubt. Thus, the offense levels under § 2F1.1 are not applicable pursuant to either standard of proof. The prosecution, which attempted to prove to the jury that Defendants knew the product was ineffective but defrauded the consuming public into believing otherwise, did not produce convincing evidence that Defendants, at any point, lacked faith in

---

**11.** *Watts*, 519 U.S. at 170, 117 S.Ct. 633 (Kennedy, J., dissenting) (criticizing the majority's evasiveness, remarking that the court should have addressed, forthrightly, the "theoretical contradiction" of considering acquitted conduct at the sentencing stage).

**12.** U.S.S.G. § 2N2.1(b)(1) contains a cross reference, stating: "If the offense involved fraud, apply § 2F1.1 (Fraud and Deceit)."

their product. To the contrary, the evidence showed that Defendants' continued disobedience of FDA regulations was, at least in part, due to their unwavering belief in the efficacy of and the public need for their product. Because the government proved neither intent to defraud nor mail fraud by a preponderance of the evidence, the 7 offense levels suggested by § 2F1.1 will not be added to Defendants' sentences.

Against this backdrop—and although finding that acquitted conduct in this case met neither a preponderance nor beyond a reasonable doubt standard—the Court now addresses its conclusion that acquitted conduct is not appropriately considered in sentencing under a preponderance of the evidence standard, but rather under a reasonable doubt standard. The underlying premises of *Booker* and its predecessors—*Jones, Apprendi, Ring, and Blakely*—detract from *Watts'* continued validity. These cases emphasize that a judge's determination at sentencing must be guided by the jury-authorized verdict. *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 2537, 159 L.Ed.2d 403 (2004) (invalidating a state mandatory sentencing guideline system and holding that when a judge inflicts punishment that the jury's verdict alone does not authorize, "the jury has not found all the facts which the law makes essential to the punishment ... and the judge exceeds his proper authority") (internal citations omitted); *Ring v. Arizona,* 536 U.S. 584, 609, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (holding unconstitutional a sentencing judge's finding of an aggravating circumstance necessary for imposition of the death penalty because it exposed Ring to a greater punishment than that authorized by the guilty verdict); *Apprendi v. New Jersey,* 530 U.S. 466,

483, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (invalidating a state "hate crime enhancement" because it doubled the maximum jury-authorized sentence; holding that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt"); *Jones v. United States,* 526 U.S. 227, 251–52, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) (concluding that a federal carjacking statute, which delineated imprisonment terms based on the extent of harm to the victim—fifteen years for no serious bodily injury, twenty five years for serious bodily injury and life if the victim died—required the government to prove the level of victim harm to the jury by proof beyond a reasonable doubt). Likewise, the remedial opinion in *Booker* limits sentences to the *jury-authorized* statutory maximum, as defined by the United States Code. *See e.g., United States v. Duncan,* 400 F.3d 1297, 1303 (11th Cir.2005) ("Justice Breyer's opinion making the Guidelines advisory essentially changes what sentence is authorized by a jury verdict—from the sentence that was authorized by mandatory Guidelines to the sentence that is authorized by the U.S.Code.").

A paradox is thus presented. *Apprendi* and its progeny, including *Booker,* have elevated the role of the jury verdict by circumscribing a defendant's sentence to the relevant statutory maximum *authorized* by a jury; yet, the jury's verdict is not heeded when it specifically withholds authorization. Stated differently, the jury is essentially ignored when it disagrees with the prosecution. This outcome is nonsensical and in contravention of the thrust of recent Supreme Court jurisprudence. The Fifth and Tenth Circuit Courts of Appeal[13] have attempted to rec-

---

**13.** The Second Circuit implied the continuing validity of *Watts,* but did not directly hold as such. *United States v. Williams,* 399 F.3d

450, 452–54 (2005). There, the court rejected the defendant's argument that the district court judge erred by considering acquitted

oncile this paradox, thereby upholding *Watts'* validity, by focusing solely on the narrow remedial holding of Justice Breyer's opinion. *See e.g., Duncan,* 400 F.3d at 1304 (*"Booker* does not suggest that the consideration of acquitted conduct violates the Sixth Amendment as long as the judge does not impose a sentence that exceeds what is authorized by the jury verdict."); *see also United States v. Magallanez,* 408 F.3d 672, 682–83, 2005 WL 1155913, at * 7–*8 (10th Cir. May 17, 2005) (admitting that the defendant "might well be excused for thinking that there is something amiss, under this constitutional principle, with allowing the judge to determine facts on which to sentence him to an additional 43 months in prison in the face of a jury verdict finding facts under which he could be required to serve no more than 78 months," but upholding the sentence because *Booker* did not sever 18 U.S.C. § 3661, which states that, during sentencing, "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence ...").[14]

■ This Court finds these cases unpersuasive and finds the jury's central role in the criminal justice system is better served by respecting the jury's findings with regard to authorized *and* unauthorized conduct. To consider unauthorized conduct would be to denigrate wholly the right to a jury trial, which is a "fundamental reservation of power in our constitutional structure." *Blakely,* 124 S.Ct. at 2539, 2540 (describing the Sixth Amendment as "not a limitation on judicial power, but a reservation of jury power"); *Apprendi,* 530 U.S. at 479–80 n. 5, 120 S.Ct. 2348 (recognizing the power of juries, from eighteenth century England through the present, to thwart the prosecution by, e.g., finding guilt of lesser included offenses or acquitting if the jury found the punishment associated with the offense "disproportionate to the seriousness of the conduct of the particular defendant"); *see generally Pimental,* 367 F.Supp.2d at 152, 2005 WL 958245, at *7 (rejecting *Watts* and finding, in light of the Supreme Court's jurisprudence, that "to consider acquitted conduct trivializes 'legal guilt' or 'legal innocence'—which is what a jury decides—in a way that is inconsistent with the tenor of recent case law[,]" which, "after *Apprendi,* [focused] on whether a given sentence exceeded what the jury verdict [or plea] authorized").

In this case, the jury exercised its power and, after four days of deliberation, found

conduct when declining to make a downward departure, stating: "Whether or not *Watts* fully survives *Booker,* Judge Gershon's finding that Williams acted deliberately, by itself, provides no basis for disturbing the sentence." *Id.* at 454.

14. Although the statement about the defendant's perception of his sentence is made in passing by the court in *Magallanez,* this Court notes that consideration of acquitted conduct has a deleterious effect on the public's view of the criminal justice system. A layperson would undoubtedly be revolted by the idea that, for example, a "person's sentence for crimes of which he has been convicted may be multiplied fourfold by taking into account conduct of which he has been acquitted."

*United States v. Frias,* 39 F.3d 391, 393 (2d Cir.1994) (Oakes, J., concurring). As Judge Oakes opined, "[t]his is jurisprudence reminiscent of Alice in Wonderland ... As the Queen of Hearts might say, "Acquittal first", sentence afterwards." *Id. See also* Daniel J. Freed, *Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on The Discretion of Sentencers,* 101 Yale L.J. 1681, 1714 (1992) ("Most lawyers, as well as ordinary citizens unfamiliar with the daily procedures of criminal law administration, are astonished to learn that a person in this society may be sentenced to prison on the basis of conduct of which a jury has acquitted him, or on the basis of charges that did not result in conviction.").

Defendants Coleman and Kaminski not guilty of mail fraud, 18 U.S.C. § 1341, and found that they acted without intent to defraud or mislead, a prerequisite to felony violations of 21 U.S.C. §§ 331, 333, and 355. Here, the verdict is clear: the jury unequivocally found Defendants not guilty on seven counts of mail fraud and found that Defendants did not have the intent to defraud or mislead on thirteen counts. This Court recognizes its power to enhance Defendants' sentence for uncharged conduct, as such conduct was neither authorized *nor* unauthorized by the jury, but concludes that considering acquitted conduct would disregard completely the jury's role in determining guilt and innocence. *See Watts,* 519 U.S. at 169–170, 117 S.Ct. 633 (Stevens, J., dissenting) (finding "[t]he notion that a charge that cannot be sustained by proof beyond a reasonable doubt may give rise to the same punishment as if it had been so proved is repugnant to . . ." "longstanding procedural requirements enshrined in our constitutional jurisprudence"); *see Pimental,* 367 F.Supp.2d at 152, 2005 WL 958245, at *7 ("The facts that the government sought to have me consider are not facts enhancing the crime of conviction, like the presence of a gun or the vulnerability of the victim. Rather, they are facts comprising different crimes, each in a different count."). Moreover, enhancements pursuant to § 2F1.1 would not only affect Defendants' liberty by lengthening the sentences imposed,[15] but would also result in the "heightened stigma associated with an offense the legislature has selected as worthy of greater

punishment." *Apprendi,* 530 U.S. at 467, 120 S.Ct. 2348. The legal innocence associated with acquittal would be summarily eviscerated.

Additionally, consideration of acquitted conduct skews the criminal justice system's power differential too much in the prosecution's favor. The government, "having failed to meet its burden of proof at trial, is permitted a second bite at the apple, a chance to make its case before an alternative decisionmaker, the sentencing judge." Barry L. Johnson, *If at First You Don't Succeed—Abolishing the Use of Acquitted Conduct in Guidelines Sentencing,* 75 N.C.L.Rev. 153, 182–183 (1996) (hereinafter *"If at First You Don't Succeed"*). This "second bite at the apple" allows the government to perfect its case and ready it for re-litigation at the sentencing "mini-trial." *Id.* Indeed, this outcome transpired in this case. At trial, Defendants presented witness testimony to support the efficacy of Ovimmune products in alleviating pain and other symptoms, apparently convincing the jury that, perhaps, the products had some medicinal power. The prosecution failed to persuade the jury otherwise. Yet, at the sentencing hearing, the prosecution called an additional witness to the stand, Dr. Barbara Paul, to try to persuade the Court that the eggs were actually completely ineffective and no different from store-bought eggs.[16] This mini-trial effectively retried Defendants Coleman and Kaminski for crimes of which they had been explicitly acquitted by a jury, thus highlighting the flaws inherent

---

**15.** The fraud enhancement would add 7 levels to the base offense level of 6, thereby embodying the situation described in *Blakely* where "the sentencing factor is a 'tail which wags the dog of the substantive offense.'" *Blakely v. Washington,* — U.S. —, 124 S.Ct. 2531, 2539, 159 L.Ed.2d 403 (2004) (citing *McMillan v. Pennsylvania,* 477 U.S. 79, 88, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986)).

**16.** Dr. Paul, who had been unable to testify during the trial, testified at the sentencing hearing that she had performed scientific experiments on the eggs and concluded that Ovimmune's eggs contained the same number of antibodies as store-bought eggs.

in a scheme which allows the prosecutor to try the same facts in front of two different fact-finders.

The Court is cognizant that a negative consequence of refusing to consider acquitted conduct is the possibility that "eliminating the availability of acquitted conduct evidence at sentencing might alter prosecutorial charging decisions ... 'creating a temptation for prosecutors to decline to bring charges that they fear could result in acquittal and wait to bring supporting facts to the court's attention at sentencing.'" *If at First You Don't Succeed* at 200 (citing Statement of Roger A. Pauley, Ex Officio Member to the U.S. Sentencing Commission 3–7 (Mar. 22, 1993), which outlined the Department of Justice's Opposition to amending the Sentencing Guidelines to prohibit consideration of acquitted conduct). While this concern is of significant import, it simply does not justify overriding jury verdicts of acquittal. In sum, the jury explicitly did not authorize sentencing pursuant to fraudulent conduct, and this Court will neither marginalize that finding nor allow the government another opportunity to make a failed case.

### IV. Imposition of Sentence

### A. Position of Public or Private Trust

The government proved by a preponderance of the evidence that Defendants Coleman and Kaminski abused a position of public or private trust, or used a special skill in any manner that significantly facilitated the commission or concealment of the offense. U.S.S.G. § 3B1.3.

■ With regard to Defendant Coleman, who has a Ph.D., the government proved by a preponderance of the evidence that she abused a position of trust to significantly facilitate the commission of the underlying offenses by portraying herself as a physician in addition to a Ph.D. Defendant Coleman argued that this enhancement was not applicable to her because posing as a physician does not by itself mean that she occupied a position of trust, which is defined as a position "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." *United States v. McCollister*, 96 Fed.Appx. 974, 976 (6th Cir.2004) (citing U.S.S.G. § 3B1.3, comment (n.1)). The turnkey question, however, is not whether she was in fact a medical doctor, but whether she occupied a position of trust. *Cf. United States v. Hodge*, 259 F.3d 549, 556 (6th Cir.2001) (finding, in the context of insurance fraud, that a two-point enhancement can be warranted under § 3B1.3 even if a therapist, as opposed to a medical doctor, is being sentenced because the insurance company relied on his honesty, just as they would rely on the honesty of a physician). Defendant Coleman, by portraying herself as a learned person who understood how to treat and cure ailments, occupied such a position. At trial, undercover agent Robert Cole testified, and produced a corroborating audio-tape, that on July 23, 2001, Defendant Coleman represented to him that she had a medical degree and two Ph.D. degrees when selling anti-chlamydia product to treat his rheumatoid arthritis and candida powder to treat his wife's toenail fungus. Moreover, Defendant Coleman admits that "there was at least one newspaper article that characterized Defendant as a medical doctor." (Def. Sent. Mem. II at 16). Even if she believed in the product she was selling, she abused a position of trust.

■ Similarly, Defendant Kaminski, a medical doctor, occupied a position of trust. *See McCollister*, 96 Fed.Appx. at 976 ("A practicing physician enjoys perhaps the highest level of discretion afforded any professional."). Like Defendant Coleman, he "significantly facilitated the commission ... of the offense" by offering

Ovimmune products to various individuals to treat and cure them of certain diseases. At trial, Jocelyn Belluck, a pregnant woman, testified that Dr. Kaminski provided her with Ovimmune's antibody products for treatment of her chronic fatigue syndrome. Similarly, Defendant Kaminski delivered Ovimmune products to Dr. David Edelberg in Chicago, Illinois, to treat patients with yeast infections. Additionally, during May of 2001, Dr. Kaminski submitted an article to the Journal of the American College of Nutrition representing that fifty-nine adult male and female individuals took antichlamydia pneumonia egg powder for chronic fatigue syndrome and/or fibromyalgia and were asymptomatic after four months, thereby promoting Ovimmune's products as able to treat and cure disease.

The trial testimony, the paper trail, and the government's arguments at the sentencing hearing meet the preponderance of the evidence standard required to show that Defendants Coleman and Kaminski abused their respective positions of trust by distributing Ovimmune products and claiming, by virtue of an advanced degree, medical or otherwise, that the product would cure various ailments.

## B. Obstruction of Justice

With regard to an enhancement for obstruction of justice, the government proved by a preponderance of the evidence that both Defendants' actions constituted an obstruction of justice pursuant to U.S.S.G. § 3C1.1.[17] Although this Court bases its finding of an obstruction of justice on an amalgam of relevant information, including the testimony at the sentencing hearing and the Court's review of the documents, the primary foundation of its finding is the Court's recollection of the facts set forth at trial.

On February 21, 2002, Marilyn A. Coleman and Ovimmune, Inc. filed a defamation suit against Sally Wiley,[18] personally and in her capacity as a school nurse for the Union County schools, seeking $15 million in damages. The suit was also brought against Jane Doe and John Doe, for libel and slander. The alleged slander of Coleman and Ovimmune arose in statements made and documents provided by Wiley and the "Does" to Douglas M. Loveland, a Senior Special Agent in the office of Criminal Investigation for the U.S. Food and Drug Administration ("SA Loveland").[19] According to SA Loveland's tes-

---

**17.** U.S.S.G. § 3C1.1 reads as follows:

If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

**18.** On February 10, 2001, Defendant Coleman contacted Sally Wiley, who was the head nurse at the Union County grade school in Richwood, Ohio, and urged Ms. Wiley to permit a clinical trial to be conducted on the student population at the school. Ms. Wiley contacted the school's superintendent, who alerted the FDA to Defendant Coleman's proposal. PIR at ¶ 16.

**19.** In a separate federal action filed with this Court, the United States sought to enjoin the state defamation case pursuant to 18 U.S.C. §§ 1513–1514, federal statutes designed to protect witnesses from retaliation and harassment. On March 13, 2002, the Honorable Edmund J. Sargus, Jr. of the United States District Court of the Southern District of Ohio, granted the government's Motion for a Temporary Restraining Order and found "sufficient evidence to indicate that the Defendants herein have engaged in a course of conduct in violation of 15 U.S.C. § 1513" and ordered Defendants to refrain from "engaging in any conduct that would intimidate or have the potential to intimidate any witnesses connected with the federal criminal investigation." *United States v. Marilyn Coleman and Ovimmune, Inc.*, No. 02–227 (S.D.Ohio Mar. 13, 2002) (order granting government's Motion for a Temporary Restraining Order).

timony at the sentencing hearing, this lawsuit prompted other potential witnesses, community members and the like, to decline to be interviewed for fear of being sued and becoming a "Jane or John Doe." Defendant Coleman also filed a complaint against SA Loveland with the Internal Affairs Division of the FDA accusing him of drawing his gun during the FDA's July 31, 2001 search of her home.[20] On August 26, 2001, Defendant Coleman sent an email to many of her friends stating that she was raided at gunpoint and warning that the FDA would be interviewing other witnesses at gunpoint.[21] Additionally, Defendant Coleman solicited an acquaintance, Bill Brown, to ask people in his internet chat group to obtain personal information about SA Loveland and his military career.[22] Defendant Coleman also filed five reports with the Union County Sheriff's Department, four of which allege that the FDA and/or the "government" prevented her receipt of mail and email, were at least tangentially involved in death threats, poisoned her well water, and broke into her house using "a garage door opener with decoder" to steal her personal computer files.[23] It appears that no serious investigations ensued on any of these charges.

■ ■ The information presented to this Court proves by a preponderance of the evidence that the claims underlying these allegations and attacks were false and done with the willful intent to impede the investigation. Indeed, after the lawsuit against Sally Wiley and "Jane or John Doe" was filed, many witnesses simply refused to talk to the agents or were openly hostile. *See* U.S.S.G. § 3C1.1, commentary (n.4) (applying enhancement where a defendant has engaged in "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so"). Additionally, an internal affairs investigation coupled with malicious internet postings had a chilling effect on SA Loveland. As he testified, the unfounded accusations harmed his career; accordingly, he requested and received another agent to accompany him on all work related to this case so that a witness would be present in case future allegations of misconduct arose, thereby doubling this investigation's cost.

20. The FDA eventually dismissed all charges as baseless.

21. At the sentencing hearing, SA Loveland submitted a binder of exhibits chronicling the events warranting a finding of obstruction of justice. Ex. 1 contained the August 26, 2001 email:

Many of you know that the FDA raided my home/office at gun point on 31 July 2001.... I know for a fact that the FDA will start at 9 AM on August 27th to systematically visit each and every person who has the egg powder. When the FDA raided me, it was so traumatic that I can not even remember for sure how many agents invaded my house.... Unless you have been "raped" by the U.S. government you do not know how intimidating this episode can be.

*See* Ex. 1 of government's Binder DL–1.

22. On September 21, 2001, Bill Brown posted the following:

I have a favor to ask of those who can do investigative work on the computer. I need to know about special agent Douglas M. Loveland and the last four cases he worked on, and their outcome. I believe he is a veteran of the air force and I would like to know the status of his discharge, especially if it was anything but honorable. Perhaps he now works for the FDA.

Ex. 2 of government's Binder DL–1.

23. Defendant Coleman filed these reports with the Union County Sheriff on November 30, 2001, January 28, 2002, May 6, 2002, May 14, 2002, and September 3, 2002. The May 14, 2002 report alleged that someone had intentionally punctured her gas line, but she did not accuse the government of having done so.

This Court also finds that the government proved by a preponderance of the evidence that Defendant Kaminski obstructed justice. First, on September 10, 2002, Defendant Kaminski attempted to impede the FDA's investigation by sending a report to Internal Affairs, titled: "OCI Special Agent Douglas Loveland ... This addendum reports subsequent break-ins, attempted murder and computer crimes." *See* Ex. 23 of government Binder DL–1. Defendant Kaminski participated in petitions to the Acting Commissioner of the FDA, the Secretary of Health and Human Services, and Congresswoman Deborah Pryce. PIR at ¶ 39. The Court finds that the government proved by a preponderance of the evidence that Dr. Kaminski's actions were performed in a willful attempt to impede the FDA's investigation by throwing up roadblocks, including leveling malicious personal attacks against SA Loveland. Accordingly, the actions of both Defendants warrant a two-point enhancement for obstruction of justice.

### C. Grouping

In the case of multiple offenses, the court must first determine whether any of the offenses should be grouped together pursuant to U.S.S.G. § 3D1.2 (titled "Groups of Closely Related Counts").[24] To help a court in this task, § 3D1.2 provides a laundry list of offenses that should and should not be grouped; however, § 2N2.1 is not listed. When an underlying guideline provision is not specifically listed, § 3D1.2 explains that "a case-by-case determination must be made based upon the facts of the case and the applicable guidelines (including specific offense characteristics and other adjustments used to determine the offense level)." U.S.S.G. § 3D1.2.

#### 1. 3D1.2(d)

The PIR suggests that grouping of all counts is appropriate pursuant to § 3D1.2(d), which states:

> Counts involve substantially the same harm ... when the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior was ongoing or continuous in nature and the offense guideline is written to cover such behavior.

U.S.S.G. § 3D1.2; PIR at ¶ 49.

The government argues that the probation officer's grouping of the counts is predicated on the assumption that the Court will use the "fraud" cross-reference. The government further contends that because the Court is not applying the "fraud" cross-reference, then the sentence will fail to account in some way for the "aggregate harm" of the offenses. The government relies on *United States v. Pilgrim Market Corp.*, 944 F.2d 14 (1st Cir.1991), in which the First Circuit held that offenses under

---

**24.** Guideline § 3D1.2 reads as follows:

All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:

(a) When counts involve the same victim and the same act or transaction.

(b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

(c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

(d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

§ 3D1.2.

§ 2N2.1 should not be grouped under § 3D1.2(d). The Court in *Pilgrim Market* interpreted § 3D1.2(d) to apply *only* if the underlying Guideline "specifically [takes] into account ongoing or continuous behavior by providing upward adjustments for repetitious behavior." *Id.* at 20. As an example, the court noted that § 3D1.2(d) found grouping appropriate for all pollution offenses because the underlying pollution guideline (U.S.S.G. § 2Q1.1) increased the offense level according to the severity and length of the polluting behavior. In contrast, the court explained: "[T]he guideline applicable to defendant's offenses, § 2N2.1, simply provides a base offense level of 6 . . . . It has no built-in adjustment increasing the offense level for repeated criminal acts." *Id.; see also United States v. Von Mitchell,* 984 F.2d 338, 339 (9th Cir.1993) ("Because the offense level under section 2N2.1 is not 'determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, counts charged under this section are not groupable . . .' ").

■ The Court finds the logic in *Pilgrim Market* persuasive and concludes that because § 2N2.1 does not account for the ongoing and continuous nature of Defendant's egg-scheme, the offenses should not be grouped under 3D1.2(d).

## 2. 3D1.2(b)

■ The Court, however, finds grouping is appropriate under § 3D1.2(b) because all of the crimes in the case sub judice are strict liability and had the same victim: society at large. U.S.S.G. § 3D1.2(b)

("Counts involve substantially the same harm . . . [w]hen counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan."). Guideline § 3D1.2(b) requires both that the counts (1) involve the same victim and (2) be connected by a common criminal objective or . . . common scheme or plan. *See, e.g. United States v. Young,* 266 F.3d 468, 473 (6th Cir.2001) ("The embezzlement group and the money laundering count were subsequently grouped pursuant to U.S.S.G. § 3D1.2(b) because both offenses involved the same victim (the City of Newaygo) and several transactions which were connected by a common scheme or plan-defrauding the City of Newaygo in order to embezzle city funds for personal expenditures.").

The government argues that there are actually five distinct victims and thus, five distinct groups.[25] The government's argument is not-well taken. The Court finds that all of the government's proposed groups had one victim: the consuming public. As stated by § 3D1.2(b), commentary (n.2):

> For offenses in which there are no identifiable victims (*e.g.,* drug or immigration offenses, where society at large is the victim), the "victim" for purposes of subsections (a) and (b) is the societal interest that is harmed. In such cases, the counts are grouped together when the societal interests that are harmed are closely related. Where one count, for example, involves unlawfully entering the United States and the other involves

---

**25.** The government's suggested groups are as follows:

(1) Sales to FYH (victim 1) from November 2000 through February 2001 (counts 9–11)

(2) Sale to Viotron (victim 2) after June 12, 2001 (count 12).

(3) Distribution to patients and undercover agent from January 2000 and continuing

throughout at least July 23, 2001 (counts 13–17 and 19–21).

(4) Manufacturing and packaging in an unregistered facility (Count 18).

(5) Adulteration of the product (Counts 22 and 23).

Letter from Government to Probation Officer (Mar. 16, 2005)

possession of fraudulent evidence of citizenship, the counts are grouped together because the societal interests harmed (the interests protected by laws governing immigration) are closely related.

The FDCA was designed as a strict liability statute to protect society at large. The "government need not prove knowledge or awareness that the drugs are misbranded or an intent to deceive or defraud." *United States v. Articles of Drug*, 825 F.2d 1238, 1246 (8th Cir.1987); *see also Rheinecker v. Forest Laboratories, Inc.*, 813 F.Supp. 1307, 1311 (S.D.Ohio 1993) (explaining violations of the FDCA, 21 U.S.C. § 301 et seq., "attach[ ] without any proof of intent, knowledge or awareness of wrongdoing") (citing *United States v. Park*, 421 U.S. 658, 672–73, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975)). The statute's strict liability nature reflected Congress's strong desire to "keep impure and adulterated food and drugs out of the channels of commerce." *United States v. Acosta*, 17 F.3d 538 (2d Cir.1994); *see also United States v. Dotterweich*, 320 U.S. 277, 280–81, 64 S.Ct. 134, 88 L.Ed. 48 (1943) ("The purposes of [the Food and Drugs Act of 1906] thus touch phases of the lives and health of the people which, in the circumstances of modern industrialism are largely beyond self-protection .... [and][s]uch legislation dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing. In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger."). Thus, the victim of Defendant Coleman's and Kaminski's crimes was society at large, and grouping of all counts pursuant to § 3D1.2(b) is therefore appropriate.

## D. Restitution

■ Defendants claim that an order for restitution is improper because Defendants' convictions do not fall under 18 U.S.C. § 3663(a),[26] which provides for restitution where the underlying offense is a Title 18 offense.[27] Both parties, however, framed their arguments around 18 U.S.C. § 3663(a), anticipating that the court would rule pursuant to said statute. The Court, however, hereby imposes restitution as a condition of probation, not supervised release.[28] This Court orders restitution pursuant to 18 U.S.C. § 3563(b)(2), which provides the court with authority to require a defendant to "make restitution to a victim of the offense ... (but not subject to the limitation of section 3663(a) or 3663A(c)(1)(A))." *Id.* This provision of 18 U.S.C. § 3563(b)(2) has been interpreted to except restitution from the limitations described in section 3663(a) when said restitution is ordered as a condition of probation. *See Gall v. United States*, 21 F.3d 107, 109–10 (interpreting 3563(b)(2) as "expressly negat[ing]" the limitations under 3663(a) "where restitution is ordered as a condition of probation ...");￼ *see also*

**26.** 18 U.S.C.A. § 3663(a)(1)(A) reads:

The court, when sentencing a defendant convicted of an offense under this title, ... may order, in addition to or, in the case of a misdemeanor, in lieu of any other penalty authorized by law, that the defendant make restitution to any victim of such offense, or if the victim is deceased, to the victim's estate.

*Id.*

**27.** The parties extensively argue over whether 18 U.S.C. § 2 is an appropriate basis for use of 3663(a). Because restitution in this case is grounded in 18 U.S.C. § 3563(b)(2), which does not rely on 3663(a), the Court need not reach this much-debated question of law.

**28.** This Sentencing Memorandum contains the Court's full view of the legal justification for imposition of restitution. With regard to said restitution, this Sentencing Memorandum hereby supercedes any prior ruling or comment made from the bench, particularly concerning the breadth or scope of 18 U.S.C. § 3663(a).

*United States v. Lexington Wholesale Co., Inc.,* 71 Fed.Appx. 507, 508 (6th Cir.2003) ("[W]here restitution is imposed as a condition of probation, the provisions of § 3563(b)[ ], the Probation Statute, override the limitations of § 3663.") (citing *Gall,* 21 F.3d at 110).

Although Defendants' strict liability offenses victimized society at large, the Court finds restitution to purchasers of Ovimmune products will compensate for any harm wrought on the consuming public. The Court orders restitution in the amount of $33,604.12, which shall be paid jointly and severally by Defendants Coleman, Kaminski and Ovimmune. This sum is based on the probation officer's tally of all sales other than those made to Raymond Suen.[29] Based on the PIR at ¶ 79, the Court finds the Defendants have the ability to pay restitution, particularly in light of the fact that Defendant Coleman has been spending almost $6,000 a year[30] since 2002 to refrigerate 49,000 pounds of egg powder at a storage facility in Pennsylvania. Defendant Kaminski, likewise, has resources to pay the required restitution. As stated at the sentencing hearing, he plans on resuming the practice of medicine in some capacity. He also has substantial assets in stock and real estate. As required by 18 U.S.C. § 3563(b)(2), the Court finds this imposition of restitution is "reasonably related to the factors set forth in section 3553(a)(1) and (a)(2)." *Id.* The restitution is commensurate with the nature and circumstances of the offense, reflects the seriousness of those offenses, and serves as a deterrent from any future conduct.

### E. 18 U.S.C. § 3553(a)

The Court understands the great import placed on its consideration of the factors outlined in 18 U.S.C. § 3553(a), and notes the strong disapproval voiced when a district court "simply selects what the judge deems an appropriate sentence without such required consideration." *United States v. Webb,* 403 F.3d 373, 383 (6th Cir.2005) ("[W]e may conclude that a sentence is unreasonable when the district judge fails to 'consider' the applicable Guidelines range or neglects to 'consider' the other factors listed in 18 U.S.C. § 3553(a), and instead simply selects what the judge deems an appropriate sentence without such required consideration.") (footnote omitted); *see also United States v. Strbac,* No. 04–4158, 2005 WL 953845, at *3 (6th Cir. Apr.25, 2005) ("The reasonableness of a sentence, according to [*Booker* ], should be determined by consulting the factors listed in 18 U.S.C. § 3553(a). Those factors include the nature and circumstances of the offense and the history and characteristics of the defendant, as well as the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with needed training and medical care.").

Neither Defendant has any prior criminal history, which places them into Criminal History Category I. Under § 2N2.1,

---

**29.** Raymond M. Suen, owner of For Your Health, Inc., purchased $55,303.51 of Ovimmune products. On July 23, 2003, in a related case, Mr. Suen entered a guilty plea to Conspiracy to Introduce an Unapproved Drug into Interstate Commerce, in violation of 18 U.S.C. § 371. On January 16, 2003, Mr. Suen and his corporation were each placed on a term of probation for three years. PIR ¶ 12. For Your Health generated $79,432.28 from sales of Ovimmune products. PIR ¶ 34. In light of Mr. Suen's profit from his sale of Ovimmune products and because of his felony conviction, the Court does not deem restitution appropriate.

**30.** At the sentencing hearing, Marilyn Coleman explained that she is currently paying $478.57 per month to store the egg powder.

both Defendants have a base offense level of 6. When the enhancements for obstruction of justice (§ 3C1.1) and abuse of a position of trust (§ 3B1.3) are added, each Defendant has a total offense level of 10. Defendants are in Zone B where the Sentencing Table suggests an imprisonment term of 6–to–12 months. According to U.S.S.G. § 5C1.1, "if the applicable guideline range is in Zone B of the Sentencing Table, the minimum term may be satisfied by—"

(1) a sentence of imprisonment; or

(2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in subsection (e), provided that at least one month is satisfied by imprisonment; or

(3) a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment according to the schedule in subsection (e).

*Id.* The Court sentenced Defendants pursuant to the third option, sentencing each Defendant to five years of probation and substituting imprisonment with six months of "community confinement" and six months of "home detention." *Id.* The terms of probation on each Count are to run concurrently. In addition to confinement, the Court also orders restitution in the amount of $33,604.12 be paid jointly and severally by Defendants Coleman, Kaminski, and Ovimmune. Based on the probation officer's sentencing recommendation, the Court finds that Defendants Coleman and Kaminski are each able to pay a $6,000 fine and a $375 special assessment.

■ The Court finds that the nature and circumstances of the offense and the history and characteristics of Defendants are such that five years of probation, with special conditions of community confinement and home detention, are appropriate. It appears to the Court that profit was exhorted over science and that Ovimmune products were distributed to the public without proper regard for any ensuing negative health effects. It is compelling to the Court that notwithstanding the March 30, 2001 conference call with the Food and Drug Administration, during which FDA representatives told Coleman and Kaminski that they needed an investigational new drug application ("IND") in effect before beginning human testing, Defendant Coleman, the very next day, held a meeting in a local church and gave away Ovimmune products. Indeed, the evidence showed that Defendants consistently circulated this product, touting it as a talisman for whatever ails one. Yet, while Defendants may have believed in their products' effectiveness as an immune booster and healer, evidence at trial, including corroborating photographs, demonstrated that the conditions in which at least some of the eggs were kept were unsanitary. The evidence included such details as rotten, moldy eggs; a dead cat stored less than three feet from raw eggs; live cats running around the basement; egg residue on surfaces; raw eggs remaining unrefrigerated for long periods; and raw eggs covered with blood and manure. This sentence balances the nature and circumstances of the offense with the Defendants' lack of any prior criminal history. Moreover, it allows Defendants, who are well-educated and very connected to their communities and families, to maintain these bonds throughout the period of confinement.

Section 3553(a)(2) instructs the Court to consider the purposes of punishment when imposing a sentence, including the need for the sentence:

(A) to reflect the seriousness of the offense, to promote respect for the law,

and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

§ 3553a(2)(A)-(D). Although the offenses were strict liability misdemeanors, they were serious nonetheless. This sentence of one year of confinement and restitution reflects the seriousness of the offenses and accomplishes the goals associated with both specific and general deterrence. 18 U.S.C. § 3553(a)(2)(B). Not only must Defendants comprehend their crimes, but others in the scientific and business communities need to be aware that similar actions will be punished. This sentence will adequately protect the public from any further crimes by Defendants, although recidivism is unlikely given the Defendants' ages.[31] *See United States v. Nellum,* No. 04–cr–30, 2005 WL 300073, at \*3 (N.D.Ind. Feb.3, 2005) (finding that recidivism drastically declines with a defendant's age). After considering "the kinds of sentences available," 18 U.S.C. § 3553(a)(3), the Court concludes that five years of probation, as opposed to one year of imprisonment or imprisonment with supervised release, will afford Defendants more time to pay restitution. 18 U.S.C. § 3553(a)(7).

In short, the Court finds that the sentence of 12 months, plus restitution, is commensurate with the Guidelines' suggested range for the underlying convictions and enhancements that the government proved by a preponderance of the evidence. 18 U.S.C. § 3553(6). After consideration of all factors set forth in 18 U.S.C. § 3553(a)(1) through (a)(7), and treating the Sentencing Guidelines as advisory only, the Court has determined, for reasons set forth in this Sentencing Memorandum, that the sentence is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in that statutory section.

## V. Conclusion

Both Defendants shall complete a term of five years probation. During this time, Defendants shall comply with all the standard conditions of probation.[32] Due to the low risk of substance abuse, the Court finds mandatory drug testing is unnecessary for either Defendant. The Court imposes the following special conditions for probation. Defendants shall serve six months of confinement at a community treatment center, with work-release only, and 6 months of home confinement, which may include electronic monitoring. Defendants are hereby ordered to pay restitution, for which Defendant Coleman, Defendant Kaminski, and Defendant Ovimmune are jointly and severally liable, in the amount of $33,604.12. Defendants are further ordered to pay a fine of $6,000 and a special assessment of $375. A Judgment and Commitment Order shall enter with respect to Defendants Coleman and Kaminski.

**IT IS SO ORDERED.**

---

**31.** Defendants Coleman and Kaminski are 59 and 63 years old, respectively.

**32.** The Court rejects the government's oral motion to strip Defendant Kaminski of any authority granted by the Drug Enforcement Agency to prescribe medication.